[Civ. No. 16430.   First Dist., Div. One.   Nov. 29, 1955.]

SAINT FRANCIS MEMORIAL HOSPITAL, Respondent, v. CITY AND COUNTY OF SAN FRANCISCO, Appellant.

Dion R. Holm, City Attorney, Agnes O'Brien Smith and Jerome Cohen, Deputy City Attorneys, for Appellant.

Clark, Heafey & Martin, Leon A. Clark and Gerald P. Martin for Respondent.

WOOD (Fred B.), J.—In this action brought by the Saint Francis Memorial Hospital to recover taxes which had been levied by the city and county of San Francisco upon three separate parcels of real property in 1951 and had been paid under protest, the trial court found and concluded that each of the properties and the hospital as owner of each met the requirements prescribed by section 214 of the Revenue and Taxation Code for the "welfare exemption" which section 1c of article XIII of the state Constitution authorized the Legislature to grant.

The principal question is whether or not the evidence supports the findings and conclusions.

The properties in question are Lot 10, which is the site of the six-story main hospital building and of a building that is used as a nurses' residence; Lot 13, which has a three-story building used as living quarters for residents and externes with about 15 per cent of the ground floor space used

as a barber shop; and Lot 21, which has a four-story building used for the hospital's school of nursing.

We entertain no doubt that these properties were "used exclusively for . . . hospital . . . or charitable purposes," a requirement imposed by the Constitution and the statute as a condition for the granting of the welfare exemption. Precisely such facilities were involved in *Cedars of Lebanon Hospital* v. *County of Los Angeles,* 35 Cal.2d 729, 735-742 [221 P.2d 31, 15 A.L.R.2d 1045], and were there determined to be used exclusively for hospital purposes.

The city and county conceded during the trial that the revenues and expenditures in relation to these properties and functions in 1951 were such that the hospital would have been entitled to the exemption that year but for a surplus of $130,400 which resulted principally, if not entirely, from the conduct of certain other functions and properties by the hospital.

The other properties and functions included Lots 2 and 3, improved to a medical building which houses a pharmacy operated by the hospital and contains a number of offices which are rented to various doctors and dentists, and a coffee shop which is operated by a tenant;[1] also, a parking lot which is operated by a tenant for the use of doctors who patronize the hospital.

This over-all $130,400 "surplus" furnishes the nub of the present controversy. The city and county contends that such a surplus furnishes proof irrefutable that in 1951 both the "property" and the "owner" of the property were "operated for profit," and thus failed to meet the requirements of subdivisions (1) and (3) of section 214. There are several fallacies in this argument.

The fact that a surplus results in a given year does not necessarily mean that either the property or its owner was operated "for" profit. There is an element of *intent* involved. "In relation to tax laws, the phrase 'conducted for profit,' which appears to be the equivalent of 'operated for profit,' has presented some difficulty but has been generally held to convey the meaning of operated or conducted for the *purpose* of making a profit. [Citations.] Accordingly, the test indicated by such phrases, as so construed, is not necessarily whether there is or may be a profit but whether the claimant is operated or conducted for the

---

[1] In 1951 the coffee shop showed a loss, not a gain. It was started that year and was operated for a time by the hospital, until a tenant could be found.

purpose of making a profit; that is, whether the charges are fixed with the intention of yielding a surplus over and above operating expenses. [Citations.]'' (*Sutter Hospital* v. *City of Sacramento*, 39 Cal.2d 33, 37 [244 P.2d 390].)

█ A surplus might be accidental, not calculated. When an institution, such as this, has an annual budget of nearly $3,000,000, with a payroll in excess of $1,600,000, a surplus of $130,400 (about 4.4 per cent of gross receipts) does not necessarily token a calculated plan to operate the institution for profit. It quite persuasively tokens prudent management. No one could seriously contend that a hospital must show a deficit at the end of each year in order to qualify as not operating for profit.

Here, the owner of the property is a nonprofit corporation organized under the laws of this state. Its articles clearly spell a nonprofit nature and, not inconsistently therewith, declare how ''any receipts in excess of expenses shall be applied.''[2]

█ There is evidence that the charges for patient's rooms at the hospital were less than the payroll expense per patient day; that the rates are not fixed with the idea or purpose of creating a profit in operation; they are set to cover operating expenses and provide necessary funds for maintenance in compliance with licensing laws; plaintiff's expenses including salaries are not excessive; the hospital had charity patients in 1951; it cared for 252 patients on a free or a part-pay

---

[2]Article II declares the following purposes: To carry on the business of a nonprofit hospital association, to conduct schools for nurses, to provide facilities for the care and hospitalization of those patients unable to pay for such services; that none of its objects or purposes contemplates the distribution of any gains or projection dividends to any member of the corporation ''but any receipts in excess of expenses shall be applied by the Board of Trustees to the care of free or part pay or entirely charity patients, to the equipment and enlargement of its institutions, and to the carrying out of the purposes of this corporation in such manner as in the judgment of the Board of Trustees may be deemed desirable and profitable.'' (Art. II of the original articles.) Here, the word ''profitable,'' quite obviously, is used in the sense of ''useful, helpful, beneficial.''

Article III was amended in 1946 to provide: ''This corporation shall have no capital stock, is not formed for profit, does not contemplate pecuniary gain or profit to the members thereof, and no part of its net earnings shall inure to the benefit of any member or individual and no part of its activities shall be devoted to carrying on propaganda or otherwise attempting to influence legislation. The property of this corporation is irrevocably dedicated to charitable, scientific or hospital purposes and upon the liquidation, dissolution or abandonment thereof will not inure to the benefit of any private person, but shall be distributed to a fund, foundation or corporation organized and operated for charitable, scientific or hospital purposes.''

basis; in addition, obstetrical and arthritic clinics and an obstetrical out-patient clinic were established for patients unable to pay the full cost of private hospital care.

It seems abundantly clear that the plaintiff, the owner of the properties for which the exemption is claimed, was organized and operated for hospital and charitable purposes and was not organized or operated for profit. Certainly, the evidence supports the trial court's findings thereon and no reviewing court may disturb them.

The same test we have just applied in respect to the "owner" should be used in determining whether a particular item of "property" was "operated . . . for profit" as that term is used in subdivision (3) of section 214. Use of that test convinces us that the evidence supports the trial court's finding on this subject. The administrative head of the hospital testified that without the income from the properties for which the welfare exemption is not claimed (office rentals, parking lot rentals, coffee shop rental, pharmacy proceeds) there would have been a deficit, and some of the exhibits tend to support him. However, defendant questions his conclusion in that regard, calling attention to the fact that on plaintiff's books the interest paid that year (about $33,000) was all charged to the hospital proper, none to the nonexempt properties. Defendant also claims that some of the hospital's insurance and overhead should be charged, in due proportion, to one or more of the nonexempt properties.[3] We find merit in such suggested readjustments but do not believe they would effect a change in the conclusions properly to be drawn. The resultant "surplus" thus accruing from the operation of the exempt properties would not furnish an adequate basis for a reviewing court to hold, as a matter of law, that the exempt properties were operated with the intent of making a profit therefrom.

Whether or not the other properties were operated with such an intent, we need not decide. If they were (it is quite conceivable that the offices and the parking lot rental rates were fixed with knowledge that they would produce a net income) the only immediate consequence would be that of rendering those particular properties ineligible for the welfare exemption in view of the provisions of subdivision (3)

[3] It does not clearly appear that plaintiff charged the pharmacy for the value of the use of the space in the medical office building which it occupied. If not, and such a charge were to be made, the pharmacy's excess of receipts over operating expenses would be reduced without charging the amount of the over-all "surplus." The difference would be credited to rentals.

of section 214. Thus, in *Young Men's Christian Assn.* v. *County of Los Angeles,* 35 Cal.2d 760 [221 P.2d 47], the disallowance of the welfare exemption for properties and portions of properties devoted to restaurants, clothing shops and similar services did not render the properties and portions of properties devoted to dormitories ineligible, nor was the owner deemed ineligible to claim the exemption for the dormitories. Similarly, in *Cedars of Lebanon Hospital* v. *County of Los Angeles, supra,* 35 Cal.2d 729, the ineligibility of the "thrift shop" did not prevent the owner from obtaining the welfare exemption for the nurses' training school property or the residences for nurses, student nurses, internes, resident doctors and other essential personnel, or the tennis court.

■ We are not holding that the medical offices-and-pharmacy building and the parking lot were purposefully "operated for profit" in 1951 or that plaintiff was not entitled to claim the welfare exemption for them. We hold simply that even if they were so operated for profit and thus not exempt that year, those facts do not under the circumstances of this case adversely affect the exemptability of the main hospital building, the living quarters for resident personnel, and the building used for plaintiff's school of nursing. Any institution organized in whole or in part for a charitable purpose must obtain money from some source with which to defray the costs of carrying on its charity function. That source might be public subscriptions, private donations,[4] endowment funds invested in revenue producing properties[4] whether the revenue comes as interest, dividends, rentals, net returns of a business enterprise, or revenue in some other form, or a combination of several varied types of income. The purposeful pursuit of such income, devoting it, when received, to the financing of the charitable function to which dedicated, does not, we think, make the institution any the less a hospital or charitable institution, despite defendant's urge to the contrary.

In passing, we note that the income producing activities in question are not foreign to plaintiff's hospital and charitable functions. An off-street parking area for the convenience of doctors who use the hospital bears an obvious relation to

---

[4]Donations would produce nearly 100 per cent net income. The cost of solicitation and of entering their receipt upon the books of the donee probably would be negligible.

Interest and dividends derived from securities owned would involve somewhat greater operating expenses (the cost of managing the investments, deciding what and where to buy or sell) but still should be largely net in their return.

those functions. A pharmacy is a necessary adjunct to any hospital. The operation of a coffee shop for the convenience of resident personnel and visitors would seem to be a reasonable incidental activity. The renting of offices to doctors and dentists bears a less obvious relation. But these offices are in the same building as the pharmacy and this building, it would seem, was acquired as a part of an entire hospital plant from plaintiff's predecessor in ownership. In the prudent management of plaintiff's affairs it would seem reasonable and desirable to continue this rental service.

Defendant makes the further contention that plaintiff is disqualified to claim the exemption because, defendant asserts, a "part of the net earnings of the owner," plaintiff herein, "inures to the benefit" of "private shareholder[s] or individual[s]" (§ 214, subd. (2)). This assertion is predicated upon the fact that in 1951 interest was paid upon certain promissory notes which plaintiff issued in 1938 in payment of part of the purchase price of its plant. These notes, dated August 1, 1938, are payable on or before 20 years after date, bear interest at a rate not greater than 4½ per cent per annum, and are payable semiannually from the "net earnings" of plaintiff as ascertained and determined by plaintiff's board of trustees to be applicable to said interest payments.

It seems obvious that we are dealing here with a debtor-creditor relationship. If this debt were in the usual form of an absolute, unqualified obligation to pay 4½ per cent interest per annum, no one would question its payment as a legitimate operating cost, ahead of the ascertainment and declaration of "net earnings," a charge and a payment not within the purview of subdivision (2) of section 214. We do not believe that the mere fact that plaintiff negotiated more favorable terms respecting the payment of this particular obligation brings it within the purview and proscription of subdivision (2). It is somewhat akin to the public debenture known as the "revenue bond," which is distinguishable from the "general obligation bond" because payable only out of a specific fund or out of the revenues of a particular revenue producing facility. But the revenue bond is still a "bond," a debt, not an ownership interest. The very use of the word "shareholder" in subdivision (2) of section 214 suggests an intent there to deal with an ownership not a debtor-creditor relationship.

Defendant makes the further argument that "all of the property is not irrevocably dedicated to hospital and charitable purposes," apparently invoking subdivision (6) of

section 214. It inferentially, if not explicitly, contends that thereby plaintiff became and is incapable of successfully claiming it is organized and operated for "hospital or charitable purposes." There are several fallacies here. The "irrevocably dedicated" feature of subdivision (6) is a quality which "property" must possess in order to have the "welfare exemption." There is no requirement that a "hospital or charitable" corporation own and operate no property that is not exempt under section 214. ▮ Also, the "requirement of irrevocable dedication is concerned with ultimate purposes rather than with present uses. Thus, the claimant's manner of operation and its use, past or present, of its properties are wholly immaterial. The critical factor is its powers with respect to its properties; and these powers, in the case of a corporate claimant, must ordinarily be ascertained from its articles of incorporation." (*Pacific Home* v. *County of Los Angeles*, 41 Cal.2d 844, 849 [264 P.2d 539].) We think that article III[5] of plaintiff's articles of incorporation, as amended in 1946, clearly effects the irrevocable dedication which subdivision (6) of section 214 requires property to have as a condition for the granting of the "welfare exemption"; as clearly as, if not more clearly than, the articles of incorporation of the plaintiff did in *Pacific Home* v. *County of Los Angeles, supra,* 41 Cal.2d 844, 849-852.

Plaintiff places considerable reliance upon a former judgment between these parties, one which found and declared these same properties tax exempt under section 214 during the fiscal years 1945-1946 through 1948-1949. This judgment, coupled with testimony that there has been no change in the condition or manner of operation of plaintiff or of these properties, plaintiff claims calls into play the doctrine of res judicata as to most if not all of the issues here involved. We entertain some doubts on that subject but deem it unnecessary to determine that question in view of our conclusions based upon the evidence herein, which we have found supports the judgment herein without the aid of the doctrine of res judicata.

▮ Plaintiff filed its welfare exemption claim with the city and county assessor on March 18, 1952, as required by section 254.5 of the Revenue and Taxation Code, claiming as exempt Lots 2 and 3 and the building thereon known as the medical offices and pharmacy building, in addition to Lots 10, 13 and 21 and the structures thereon which comprise

---

[5]See text thereof in footnote on page 325, above.

the main hospital building, the nursing school, and the living quarters for resident personnel.

Later, plaintiff filed a revised financial statement and a letter dated June 26, 1952, withdrawing its welfare exemption claim for Lots 2 and 3 and the improvements thereon. The financial statement was designed to show certain adjustments incident to this withdrawal. Then, on June 30, 1952, apparently in response to a suggestion from the assessor's office, plaintiff filed a letter and statement comparing the original and the revised claims and furnishing considerable explanatory detail.

The parties have discussed at some length the right, if any, of the plaintiff to file a revision of claim after April 1, 1952, the deadline prescribed by section 254.5 of the code. We entertain no doubt of the right of plaintiff to withdraw Lots 2 and 3 from the scope of its claim. The owner certainly had the power to waive as to those lots by not claiming the exemption for them in the first instance. We find in the statute no mandate prohibiting waiver after the filing of an exemption claim therefor. The revised financial statement is not pivotally important to the effective withdrawal or waiver of such a claim but in the instant case it did contain some information that was helpful though not indispensable in considering the remaining properties.

The principal new item in the revised statement was a change in the method of depreciation, from the original cost plus additions to the replacement value method. This would have increased the depreciation to such an extent as to produce an over-all deficit instead of a surplus. However, that change in method had not yet been made at the time of the filing date (April 1, 1952); indeed, it apparently was not made or entered on plaintiff's books, if at all, until after the fiscal year which ended June 30, 1952. Accordingly, without holding that method unavailable to plaintiff for the 1951 tax year, we have made our analysis and have drawn our conclusions upon the basis of the depreciation method reflected in the claim as first filed. We understand that defendant does not question this method. During the trial defendant's counsel said it was permissible to use it in 1951.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.

A petition for a rehearing was denied December 29, 1955, and appellant's petition for a hearing by the Supreme Court was denied January 25, 1956.