[Civ. No. 23940.   First Dist., Div. One.   Sept. 21, 1967.]

SAN FRANCISCO BOYS' CLUB, INC., Plaintiff and Respondent, v. COUNTY OF MENDOCINO et al., Defendants and Appellants.

Thomas F. Cleland and Arthur B. Broaddus, District Attorneys, and Gerald A. Sperry, Deputy District Attorney, for Defendants and Appellants.

Shearer, Thomas & Lanctot, Shearer, Lanctot, Thomas & Knorp, Russell Shearer and Albert F. Knorp, Jr., for Plaintiff and Respondent.

SIMS, J.—Defendants, the County of Mendocino and various public officials of that county, who were sued in their official capacity, have appealed from a judgment entered in four consolidated actions in which plaintiff, San Francisco Boys' Club, Inc., sought and was awarded a refund of real property taxes paid under protest on assessments made for the fiscal years 1962-1963, 1963-1964, 1964-1965 and 1965-1966. The trial court upheld the taxpayer's claim that the property in question was exempt from taxation under the provisions of section 1c of article XIII of the California Constitution and section 214 of the Revenue and Taxation Code.

Defendants contend that the taxpayer was not entitled to an exemption, and the resulting refund, because its entire property was not exclusively used for an exempt purpose as required by the constitutional and statutory provisions. As a corollary, they urge that the trial court erred in failing to expressly find, as a matter of fact, whether the property had been exclusively used for charitable purposes. Review reveals that the trial court properly concluded that the taxpayer was entitled to the exemption, and that the defendants cannot complain of the failure to find on the issue presented by them because it is a mixed question of fact and law, and, in any event, could only be resolved adversely to defendants in the light of the facts expressly found by the trial court.

The facts before this court are set forth in an agreed statement (Cal. Rules of Court, rule 6a) which in turn adopts and supplements substantially all of the facts found by the trial court. They may be summarized as follows:

The San Francisco Boys' Club is a nonprofit corporation organized under the laws of the State of California, and operated exclusively for charitable purposes. Its articles of incorporation, indicate the purpose of the club, generally, is to promote the well-being of boys of San Francisco; that it is not organized and operated for profit and that no part of its net earnings accrue to the benefit of any private shareholder or individual. The corporation has no shareholders; it is a membership corporation. Article XVII further provides that

in the event of liquidation, dissolution or abandonment, the corporation's property "will not inure to the benefit of any private person, but shall be distributed to a fund, foundation or corporation organized and operated for charitable purposes."

The club operates three clubhouses for boys in San Francisco, and in addition operates a summer camp in Mendocino County. The camp provides the opportunity for boys to go to camp for one or more periods of two weeks for five sessions during the summer. The boys are always charged less than the actual cost of the vacation, although the cost is approximately equal to the out-of-pocket expense for the operation of the camp. However, approximately 50 percent of the boys going to camp attend at reduced rates, the difference between the contribution of such boy or his family being furnished by the club through its campership fund or by other organizations of the same general character.

The camp covers 1,937.98 acres of land in Mendocino County. Of this total acreage, 548.73 acres were held tax exempt, while 1,389.25 acres were taxed. The permanent buildings of the camp lie in the exempted area. The parcels that were not exempted contain the gathering source of the principal water supply of the boys' club camp, trails which have been in use by the boys' club for more than 20 years, the area used by the boys' club camp as a dump, the Camp Seven Road and the new road to the Sherwood Forest, the trails through the forest to the northerly boundary of the property on the Sherwood Road, and the campsite at the line shack adjacent to the Sherwood Road, and an intermediate campsite.

For the 10-week period of the camping season all of the forest trails and away-from-camp overnight camp sites are available for use and the entire property is used for the operation of the camp. Over 200 boys attended the camp during each of five two-week sessions.

In 1960 the club began selling timber, logged from its property. The decision to sell such timber was made by the directors who determined the timber should be harvested, and if not harvested, would be wasted; the directors further determined that the roads constructed because of the logging operations would improve safety in case of emergency. The logging operations were carried on by independent contractors

hired by the purchaser of the timber. The cutting of timber was prohibited during the camping season, and the cutting did not in any way prevent the use of any portion of the premises as a camp. The income from timber sales during the tax years in dispute averaged about $20,000 a year. Approximately 25 percent of the receipts were used to provide permanent roads into the main living area of the camp, from the Sherwood Road, a county road on the north, and from the main living area to the Jackson State Forest on the south. All of such receipts have been devoted to the purposes of the boys' club.

The County of Mendocino did not attempt to withhold the club's exemption until the 1962-1963 fiscal year.[1] In that year, and in the subsequent years involved, taxes were levied against 1,389.25 acres of camp property which contained timber and certain camp facilities. The remaining 537.33 acres of the camp's property, where the main buildings were located, were not taxed. During the period in question the club has paid the tax assessor, under protest, $4,914.02.

Insofar as is pertinent to this case, the Constitution since 1944 has provided and now provides: "In addition to such exemptions as are now provided in this Constitution, the Legislature may exempt from taxation all or any portion of *property used exclusively for* religious, hospital or *charitable purposes* and owned by community chests, funds, foundations or corporations organized and operated for religious, hospital or charitable purposes, not conducted for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual. . . ." (Cal. Const., art. XIII, § 1c; italics added.)

Pursuant to this authority the Legislature adopted and from time to time has revised section 214 of the Revenue and Taxation Code, the so-called welfare exemption. (Stats. 1945, ch. 241. § 1, p. 706; Stats. 1949, ch. 642, § 1, p. 1150; Stats. 1951, ch. 242, § 1, p. 502; Stats. 1953, ch. 730, § 1, p 1994 [operative Jan. 1, 1953, ch. 730, § 2, p. 1995, and effective May 18, 1953 as emergency legislation, ch. 730, § 4. pp. 1995-1996]; Stats. 1955, ch. 1067, § 1, p. 2034; Stats. 1965, ch. 869, § 1, p. 2471; and Stats. 1966, 1st Ex. Sess., ch. 121, § 1, p. 605.) It

---

[1]The club does not, and cannot, claim that the tax exemptions granted for the 1960-1961 and 1961-1962 fiscal years perpetuate its right to claim tax exemptions for subsequent years. (*Goodwill Industries* v. *County of Los Angeles* (1953) 117 Cal.App.2d 19 [254 P.2d 877].)

is conceded that the club complies with all the requirements imposed by the Legislature in that section, except those relating to use of the property, which, during the years in question read, and now read as follows: "Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if: . . . (3) The property is used for the actual operation of the exempt activity; . . ." (See Rev. & Tax. Code, § 214.)

The guiding principles for interpreting the constitutional and statutory provisions were enunciated in a series of cases decided by the Supreme Court of this state in 1950. ▮ It is established that "the rule of strict construction applies to the welfare exemption law and the institution seeking its benefit must clearly show that it comes within the terms thereof; but adherence to this rule does not require so rigid and narrow an interpretation of the exempting language as to defeat the apparent design of the lawmakers. In short, there must be a strict but reasonable construction of this law as applied to the particular facts at hand. To this point it would appear that the exemption of property 'used exclusively for religious . . . or charitable purposes' should be held to include any property of the religious or charitable entity which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of religious or charitable purposes. The integrated activities as a whole must be examined in determining the tax status of property for the welfare exemption." (*Serra Retreat* v. *County of Los Angeles* (1950) 35 Cal.2d 755, 758 [221 P.2d 59], following *Cedars of Lebanon Hospital* v. *County of Los Angeles* (1950) 35 Cal.2d 729, 734-736 [221 P.2d 31, 15 A.L.R.2d 1045]; *accord*: *Y.M.C.A.* v. *County of Los Angeles*, (1950) 35 Cal.2d 760, 767 [221 P.2d 47]; *Fredericka Home* v. *County of San Diego* (1950) 35 Cal.2d 789, 795-796 [221 P.2d 68]; *Sarah Dix Hamlin School* v. *City & County of San Francisco* (1963) 221 Cal.App.2d 336, 342 [34 Cal.Rptr. 376]; *Samarkand of Santa Barbara, Inc.* v. *County of Santa Barbara* (1963) 216 Cal.App.2d 341, 355-356 [31 Cal.Rptr. 151]; *Saint Germain Foundation* v. *County of Siskiyou* (1963) 212 Cal.App.2d 911, 915 and 917-918 [28 Cal.Rptr. 393]; *National Charity League, Inc.* v. *County of Los Angeles*, (1958) 164 Cal.App.2d 241, 245-247 [330 P.2d 666]; *Fellowship of*

*Humanity* v. *County of Alameda* (1957) 153 Cal.App.2d 673, 680 [315 P.2d 394]; *Church Divinity School* v. *County of Alameda* (1957) 152 Cal.App.2d 496, 502 [314 P.2d 209]: *House of Rest* v. *County of Los Angeles* (1957) 151 Cal.App. 2d 523, 527 and 532-536 [312 P.2d 392]; *St. Francis Hospital* v. *City & County of San Francisco* (1955) 137 Cal.App.2d 321, 324 [290 P.2d 275]; and see *Stockton Civic Theatre* v. *Board of Supervisors* (1967) 66 Cal.2d 13, 16-19 [56 Cal. Rptr. 658, 423 P.2d 810]; *Westminster Memorial Park* v. *County of Orange* (1960) 54 Cal.2d 488, 494-495 [6 Cal.Rptr. 755, 354 P.2d 247]; and *Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33. 35-36 [244 P.2d 390].)

Defendants do not question the foregoing rules, but in fact rely upon them. They contend that the use of almost 2,000 acres of land for 200 boys for a period of 10 weeks in the year is in excess of what is reasonably necessary for the accomplishment of the acknowledged charitable purposes of the boys' club. Who is to determine what acreage is reasonably necessary to provide outdoor recreation for city boys? The assessor, the board of supervisors, the trial court, an appellate court, or the board of directors of the charity? The Legislature unquestionably has power under the constitutional provision to limit the exemption to "any portion" of the property it may designate. Until it acts, and in the absence of any showing of subterfuge or fraud, the determination of those responsible for carrying out the eleemosynary purposes of the club should be respected.

In concurring and dissenting in *Cedars of Lebanon Hospital* v. *County of Los Angeles, supra,* Shenk, J. urged that "the wider compass in the expression of use for hospital *purposes* should include every purpose deemed essential to operation as a hospital." He noted, "In this aspect the determination of necessity by the owners and operators should be given proper weight." (35 Cal.2d at p. 751; and see *Church Divinity School* v. *County of Alameda, supra,* 152 Cal.App.2d 496, 504; *St. Francis Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 327-328; *County of Hanover* v. *Trustees of Randolph-Macon College* (1962) 203 Va. 613, 618 [125 S.E.2d 812, 816]; *Assessors of Dover* v. *Dominican Fathers Province of St. Joseph* (1956) 334 Mass. 530, 540-541 [137 N.E.2d 225. 231-232]; *Horton* v. *Fountain Valley School of Colorado* (1936) 98 Colo. 480, 484-485 [56 P.2d 933. 936]; *United Presbyterian Women's Assn. of North America* v.

*Butler County* (1933) 110 Pa. Super. 116 [167 A. 389, 392];
*Emerson* v. *Trustees of Milton Academy* (1904) 185 Mass.
414, 415 [70 N.E. 442-443]; *Massachusetts General Hospital* v.
*Inhabitants of Somerville* (1869) 101 Mass. 319, 321-322; but
cf. *Pittsburgh Bible Institute* v. *Board of Property Assess-
ment* (1961) 405 Pa. 297, 303 [175 A.2d 82, 85]; *Creel* v.
*Pueblo Masonic Bldg. Assn.* (1937) 100 Colo. 281, 287-291 [68
P.2d 23, 26-27]; and see, Annotations on Tax Exemptions,
Church Parking Lot, 75 A.L.R.2d (1961) 1106; Dining
Facilities, 72 A.L.R.2d (1960) 521; Housing of Personnel, 15
A.L.R.2d (1951) 1064; and Extent of Area, 134 A.L.R.
(1941) 1176.)

In the *Cedars of Lebanon Hospital* case the majority
opinion discussed a tennis court which was acknowledgedly of
a reasonable cost and size in relationship to the cost and size
of the hospital. The opinion states: "Perhaps it may not be
said that such recreational facility, in its use by either
patients or essential personnel, is indispensable to the accom-
plishment of hospital purposes; but absolute indispensability
does not commend itself as an appropriate test, and it finds no
support in the authorities." (35 Cal.2d at p. 745; and see
*Samarkand of Santa Barbara, Inc.* v. *County of Santa Bar-
bara, supra,* 216 Cal.App.2d 341, 355; *Church Divinity School*
v. *County of Alameda, supra,* 152 Cal.App.2d 496, 502-503;
and *House of Rest* v. *County of Los Angeles, supra,* 151 Cal.
App.2d 523, 532-533.)

In the instant case, the trial court found that all of
the real property is used for the operation of a boys' camp.
The agreed statement recites: "that all of said property and
the forest trails and camp sites situate on all of it are used for
hiking and overnight camping during the Boys' Club Camp
sessions; that during the summer season the entire property is
used for the operation of the Boys' Club Camp; . . ." The
matter is governed by *Saint Germain Foundation* v. *County
of Siskiyou, supra,* 212 Cal.App.2d 911, where the court
observed: "The trial court's conclusion that plaintiff founda-
tion was a religious organization entitled to exemption from
taxation as such must be sustained, and whether or not the
parcels of property found by the court to be exempt from
taxation were entitled to such exemption was a question of
fact for the trial court to determine. Appellant has made a
vigorous argument as to the insufficiency of the evidence but
its argument is merely one as to the weight of the evidence."

(212 Cal.App.2d at pp. 918-919; and see *St. Francis Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 326; and *Flathead Lake Methodist Camp* v. *Webb* (1965) 144 Mont. 565, 574 [399 P.2d 90, 95].)

It is concluded that unless some other activity on or use of the property operates to destroy the claimed exemption (see *Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d 336, 342) there was no warrant for taxing the property.

The gravamen of defendants' complaint is that the tail is wagging the dog; that the acreage cannot be deemed "used *exclusively* for . . . charitable purposes" when the "integrated activities as a whole" are examined. (See *Plattsburgh College B. & E. Assn. Inc.* v. *Board of Assessors* (1964) 43 Misc.2d 741, 749-751 [252 N.Y.S.2d 229, 237-239]; *People* v. *Mills* (1946) 188 Misc. 593, 593-594 [65 N.Y.S.2d 231, 232]; *Standard Oil Co. of Texas* v. *State* (Tex.Civ.App. 1940) 142 S.W.2d 519, 522; Curtiss, *Tax Exemption of Educational Property in New York,* 52 Cornell L.Q. (1967) 551, pp. 561-568.) Resolution of this contention necessitates consideration of the extent to which collateral uses may destroy the exemption.

Prior to the adoption of section 1c of article XIII in 1944, it was established that a hotel purchased by a cemetery association as an investment was not exempt under the provisions of section 1b of article XIII, which relieved from taxation "property used or held exclusively for the burial or other permanent deposit of the human dead or for the care, maintenance or upkeep of such property or such dead, . . ." despite the fact that the income from the hotel was unalterably devoted to such purposes. (*Cypress Lawn Cemetery Assn.* v. *City & County of San Francisco* (1931) 211 Cal. 387, 390-391 [295 P. 813].) It was also recognized that the proviso in section 1b that cemetery land "used or held for profit" would not be exempt, did not preclude selling plots at a price in excess of their cost. "The word 'profit' does not mean financial benefit that accrues to the association through the sale of burial space at a price in excess of its cost where such gain is used for the upkeep of the cemetery property. The word 'profit' in article XIII, section 1b, means net earnings the benefits of which accrue directly or indirectly to the stockholders or members of the association." (*San Gabriel etc. Assn.* v. *County of Los Angeles* (1942) 49 Cal.App.2d 624,

626 [122 P.2d 330]; and see *Westminster Memorial Park* v. *County of Orange, supra,* 54 Cal.2d 488, 496-497.)

With this background, the Legislature in exercising the authority conferred in 1944 by the adoption of section 1c, provided the following condition in subdivision (3) of section 214 of the Revenue and Taxation Code as originally adopted, "The property is not used or operated by the owner or by any other person for profit regardless of the purposes to which the profit is devoted; . . ." Under this provision it was held that the exemption was not defeated because fees were charged by a home for the aged, or because rental was charged for dormitories maintained by the Y.M.C.A. for its members. (*Fredericka Home* v. *County of San Diego, supra,* 35 Cal.2d 789, 793; and *Y.M.C.A.* v. *County of Los Angeles, supra,* 35 Cal.2d 760, 770-771.) In those cases no profit was shown from the activity in question, and the question of whether a profit from one charitable activity in a general charitable program would defeat the exemption was not directly settled. (Cf. *Y.M.C.A.* v. *County of Los Angeles, supra,* 35 Cal.2d at pp. 771-772; and Schauer, J., concurring at pp. 776-778.) However, the maintenance in a hospital of a thrift shop to raise funds for charity was found to render the portion of the premises devoted to that use, nonexempt because it was property used for profit. (*Cedars of Lebanon Hospital* v. *County of Los Angeles, supra,* 35 Cal.2d 729, 745-746.) In *Y.M.C.A.* v. *County of Los Angeles,* the court stated: "Under the agreed facts here, the conclusion is inescapable that the restaurant, as well as the tailor and barber shops, all available to the public as well as to plaintiff's members, and charging standard prices for their respective services in competition with like enterprises maintained in the community, are largely commercial in character and properly classifiable as business ventures. That the money derived therefrom may be used exclusively for plaintiff's operational upkeep as a charitable organization (*Cypress Lawn Cemetery Assn.* v. *City & County of San Francisco* (1931) *supra,* 211 Cal. 387, 390) or that such facilities may be desirable in the promotion of plaintiff's general service plan does not alter the fact that they involve the use of portions of plaintiff's property for facilities which are not merely incidental to and reasonably necessary for the accomplishment of exempt purposes." (35 Cal.2d at p. 775; but cf. *St. Francis Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 326-328.)

The foregoing nonexempt activities did not destroy the exemption for that portion of the premises devoted absolutely to charitable purposes. However, in *Sutter Hospital* v. *City of Sacramento, supra,* it was established that the hospital was operated for a profit which was applied to pay off an indebtedness and provide for expansion. The court concluded: "If subdivision three had been omitted, it might well be argued that the Legislature intended that the nonprofit conditions of subdivision one would be satisfied so long as none of the 'net earnings' inured to the benefit of any private individual. But subdivision three cannot be declared to have been inserted without reason, and it seems clear that it was intended thereby to broaden the profit concept so as to deny exemption whenever the property is operated for the purpose of profit 'regardless of the purposes to which the profit is devoted.' Thus it appears that the Legislature adopted a different concept of 'profit' for the purposes of section 214 by providing that the nonprofit requirements could not be satisfied merely by devoting the net earnings to exempt (hospital) purposes. In any event, the most that can be said is that there is grave doubt as to whether the Legislature intended that the property used as is plaintiff's property, by an owner operating for the admitted purpose of producing net earnings, was intended to be accorded the exemption. In such circumstances, settled principles of statutory construction require that any doubt be resolved against the right to the exemption." (39 Cal.2d at p. 39; but cf. *Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d 336, 341-342; and *St. Francis Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 324-325.)

The following year the Legislature amended section 214 to permit nonprofit hospitals to have excess operating revenues in a sum equivalent to 10 percent of operating expenses. More significantly for present purposes, subdivision (3) was amended to read as it presently does: "The property is used for the actual operation of the exempt activity." The statute purported to be retroactive to January 1, 1953, and was made effective immediately (May 18, 1953) as an emergency measure. (Stats. 1953, ch. 730, §§ 1, 2 and 4, pp. 1994-1995.) The recitals of urgency include the following: "[I]t was the purpose and the intent of Legislature in the adoption of subdivision (3) of Section 214 of the Revenue and Taxation Code to

disqualify for tax exemption any property of a tax exempt organization which was not used for the actual operation of the exempt activity, but that such organization could rightfully use the income from the property devoted to the exempt activity for the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies without losing the tax exempt status of its property. . . . It has never been the intention of the Legislature that the property of nonprofit religious, hospital or charitable organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, it having been the intent of the Legislature in adopting subsection (3) of Section 214 to deny exemption to property not used for exempt purposes even though the income from the property was used to support an exempt activity.''[2]

---

[2]The entire section reads: ''Sec. 4. This act is an urgency measure necessary for the immediate preservation of the public peace, health or safety within the meaning of Article IV of the Constitution, and shall go into immediate effect. The facts constituting such necessity are: Continuously since the adoption of the 'welfare exemption' it has been understood by the administrators of the law, as well as by the public generally, that it was the purpose and the intent of Legislature in the adoption of subdivision (3) of Section 214 of the Revenue and Taxation Code to disqualify for tax exemption any property of a tax exempt organization which was not used for the actual operation of the exempt activity, but that such organization could rightfully use the income from the property devoted to the exempt activity for the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies without losing the tax exempt status of its property.

''Recently, doubt has been cast upon the foregoing interpretation by a decision of the State Supreme Court involving the tax exemption of a hospital. This decision was broad in its application and has caused the postponement or actual abandonment of plans for urgently needed hospital construction and expansion at a time when there are insufficient hospital facilities in this State to properly care for the health needs of its citizens, and virtually no surplus facilities for use in case of serious epidemic or disaster. This Legislature has recognized that in addition to gifts and bequests the traditional method for the financing of the expansion and construction of voluntary religious and community nonprofit hospital facilities is through the use of receipts from the actual operating facilities. In its decision the Supreme Court indicated that this was a matter for legislative clarification.

''It has never been the intention of the Legislature that the property of nonprofit religious, hospital or charitable organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, it having been the intent of the Legislature in adopting subsection (3) of Section 214 to

The law then reverted to the status envisioned in the *Sutter Hospital* case where the court had stated, "If subdivision three had been omitted, it might well be argued that the Legislature intended that the nonprofit conditions of subdivision one would be satisfied so long as none of the 'net earnings' inured to the benefit of any private individual." (39 Cal.2d at p. 39.) There was no longer any ban on profits resulting from the fees charged for charitable activities, which were to be devoted to the continued furnishing of those activities. "Neither the Constitution nor the statute prohibits the earning of an operating surplus in the prudent management of exempt property, where no part of such earnings may inure to the benefit of any private shareholder or individual, or where as here, all of the property, including the operating surplus, is devoted to the exempt purposes for which the property is used. [Citations.]" (*Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d 336, 341-342.)

In this case the logging operation is not an activity which is "integrated into any educational or training program" conducted in the boys' club. (See *Y.M.C.A.* v. *County of Los Angeles, supra,* 35 Cal.2d 760, 775.) Nor do the receipts from the timber sales constitute an operating surplus from the receipts and expenses of the charitable activity. (See *Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d at p. 342.) On the other hand, those receipts are not income from property held solely for investment or commercial or business purposes. (See *Y.M.C.A.* v. *County of Los Angeles, supra,* 35 Cal.2d at pp. 775-776; and *Cypress Lawn Cemetery Assn.* v. *City & County of San Francisco, supra,* 211 Cal. at p. 390.) "The property is used for the actual operation of the exempt activity." (Rev. & Tax. Code, § 214, subd. (3).) In order to give effect to the purport of the statute as amended in 1953, the charitable entity must be permitted to manage its property as a prudent owner. If incidental to that management it is reasonable to harvest the

deny exemption to property not used for exempt purposes even though the income from the property was used to support an exempt activity.

"Therefore, in order to clarify the legislative intent and to remove any doubt with respect to the status of property actually used for exempt purposes, it is necessary to amend subdivision (3) of Section 214 of the Revenue and Taxation Code. It is essential that this be done at the earliest possible moment to avoid further delays in the construction and expansion of needed hospital facilities."

timber growing on the property, such an operation is compatible with and not hostile to its use for the charitable activity. Being a part and parcel of that use, it does not detract from, or destroy, the exclusiveness of that use. This construction is supported by the following principle: "Under the cases, it is certainly well settled that however strict the courts may be in determining whether the use of property brings it within the exemption at all, if the court once holds that the property generally qualifies for the exemption, it will be extremely liberal in holding that some incidental use does not take it out of the exemption." (*Fellowship of Humanity* v. *County of Alameda, supra,* 153 Cal.App.2d 673, 699; and see *Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d 336, 342; *Saint Germain Foundation* v. *County of Siskiyou, supra,* 212 Cal.App.2d 911, 917; *St. Francis Hospital* v. *City & County of San Francisco, supra,* 137 Cal.App.2d 321, 327-328; *County of Hanover* v. *Trustees of Randolph-Macon College, supra,* 203 Va. 613, 617-618 [125 S.E.2d 812, 815-816]; *Hahn* v. *County of Walworth* (1961) 14 Wis.2d 147, 157-158 [109 N.W.2d 653, 658, 94 A.L.R.2d 618]; *Emerson* v. *Trustees of Milton Academy, supra,* 185 Mass. 414, 415 [70 N.E. 442].)

In *New York Conference Assoc.* v. *Schenck* (1952) 304 N.Y. 706 [107 N.E.2d 654], the New York Court of Appeals in a memorandum opinion, affirmed an exemption in the face of a claim that the sale of substantial or regular surpluses of farm products would deprive a religious organization of an exemption concededly not lost by production for consumption by those engaged in the educational activities of that organization. A referee's report recommending the exemption had been submitted to and had been approved by the Supreme Court (*Application of New York Conference Assn.* (1948) 80 N.Y.S.2d 8). The appellate division granted a new trial for the purpose of further development of the facts (*Application of New York Conference Assn.* (1949) 275 App.Div. 742 [87 N.Y.S.2d 708]).

The second report of the referee states the question in language which is relevant to this case: "The crucial issue is: Was this farm 'used exclusively' to carry out one or more purposes of relator's incorporation, or was it 'tainted with commercialism.' The answer is to be found in the legislative intent of the governing Statute and the decisional interpretation of the Courts." (*Application of New York Conference*

*Assn.* (1949) 111 N.Y.S.2d 329, 342.) After reviewing many authorities dealing with the problem (*id.,* pp. 342-352) the referee concluded: "Since this whole farm was used exclusively in the prosecution of relator's educational program, it follows that the surplus was incidental to that exclusive use" (*id.,* p. 352). This second report was disaffirmed at the trial court level (see 111 N.Y.S.2d at p. 329). The opinion of the appellate division, which was affirmed by the Court of Appeals (304 N.Y. 706 [107 N.E.2d 654], *supra*), reversed the trial court and confirmed the report of the referee. (*Application of New York Conference of Seventh Day Adventists* (1952) 279 App.Div. 845 [109 N.Y.S.2d 774].) Similar results obtained in *People* v. *Haring* (1960) 8 N.Y.2d 350, 358 [170 N.E.2d 677, 681].

It is true that in this case the youth, who are the objects of the charitable activities of the taxpayer, are not engaged in or being trained in forestry. Nevertheless, the clearing and prudent management of the land used by them for recreation should not taint the exemption otherwise available any more than should the sale of surplus produce which would otherwise be wasted. (See 111 N.Y.S.2d at pp. 333-335.)

Defendants fail to accept the concept that the reasonable management of the property is consistent with its exclusive use as a boys' camp. They raise specters of vast tree farms held tax free for the profit of lumbering companies, and of hotels taken off the tax rolls by use of a charitable device. In neither hypothesis is it suggested, as found and agreed here, that the entire area is used for the charitable purpose during the period it is feasible to do so, that the entire proceeds from timber harvest are devoted to charitable purposes, and that no one else benefits from the operation. If and when an abuse arises it may be dealt with by the courts or the Legislature. This case is governed by its own peculiar facts.

The trial court found: "That the whole of said property is necessary for and is used for the operation of such boys' camp and to furnish an adequate area in which such activities can be conducted and the requisite water supply and means of ingress and egress can be assured"; and concluded: "That the sale of timber as hereinabove found, and the cutting thereof as hereinabove found, was not a use of the property for purposes other than the maintenance of the boys' camp, within the meaning of the provisions of the Constitution of

the State of California and Section 214 of the Revenue and Taxation Code, as amended in 1953."

Defendants requested findings reading as follows: "The sale of timber constitutes a commercial profit-making venture unrelated to camp activities and is not a use of the property for camp purposes"; and "The property of the plaintiff has not been used exclusively for charitable purposes." They also objected to the proposed conclusions of law on the ground that the property was not exclusively used for charitable purposes, and further requested a finding on the issue, "Whether the plaintiff's use of the property has been exclusively for charitable purposes."

In *Garber* v. *City of Los Angeles* (1964) 226 Cal.App.2d 349 [38 Cal.Rptr. 157], the court construed section 634 of the Code of Civil Procedure as amended in 1959 and stated: "It is evident from the background of the legislation that its purpose was to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case. The purpose of the amendment was to compel the trial judge, when requested, to make findings on specified material issues of fact. (*Calloway* v. *Downie,* 195 Cal.App.2d 348, 353 [15 Cal.Rptr. 747].) In *Hine* v. *Carmichael,* 205 Cal.App.2d 663, 666 [23 Cal.Rptr. 331], the court stated: 'Failure to make definite findings on factual issues presented by pleadings, particularly where there is substantial evidence which would have sustained a finding for the appealing party, requires a reversal.' " (226 Cal.App.2d at p. 355; and see *Walner* v. *City of Turlock* (1964) 230 Cal.App.2d 399, 406 [41 Cal.Rptr. 29].)

■ The evidence on which the defendants rely to secure a finding that the property was used other than exclusively for charitable purposes is that relating to the logging operations and the sale of timber as set forth in the findings and the agreed statement. The court considered this evidence. The recital that the cutting and sale of timber was not a use of property for purposes other than the maintenance of the boys' camp, although contained in the conclusions of law, is a finding of ultimate fact which covers the subject and precludes and is irreconcilable with the antithetical finding sought by defendants. Under these circumstances there is no recognizable failure to make a finding. (See *Kerr Land &*

*Timber Co.* v. *Emmerson* (1965) 233 Cal.App.2d 200, 223 [43 Cal.Rptr. 333].)

The trial court's analysis is sustained on the law and the facts. (See *Saint Germain Foundation* v. *County of Siskiyou, supra,* 212 Cal.App.2d 911, 918-919; *Flathead Lake Methodist Camp* v. *Webb, supra,* 144 Mont. 565, 574 [399 P.2d 90, 95].)

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 15, 1967. Traynor, C. J., and Burke, J., were of the opinion that the petition should be granted.