[Civ. No. 41804. First Dist., Div. Four. May 26, 1978.]

CHRIST THE GOOD SHEPHERD LUTHERAN CHURCH OF
SAN JOSE, Plaintiff and Respondent, v.
DWIGHT L. MATHIESEN, as Tax Assessor, etc., et al.,
Defendants and Appellants.

356

COUNSEL

Evelle J. Younger, Attorney General, Ernest P. Goodman, Assistant Attorney General, Philip M. Plant, Deputy Attorney General, Selby Brown, Jr., County Counsel, and Robert J. Menifee, Deputy County Counsel, for Defendants and Appellants.

Carlstrom, Heyler & Mitchell and T. C. Carlstrom for Plaintiff and Respondent.

Marcia Rosen, Janet Saunders, A. Wallace Tashima, Laura Stern Seaver, Alan G. Benjamin, Morrison & Foerster and Richard S. Kinyon as Amici Curiae.

OPINION

PAIK, J.*—Defendants-appellants Dwight L. Mathiesen, Tax Assesor, and Carl Martin, Tax Collector of Santa Clara County, the County of Santa Clara, the City of San Jose and the California State Board of Equalization (hereafter referred to collectively as appellants) appeal from a judgment in Santa Clara County Superior Court in favor of plaintiff-respondent Christ the Good Shepherd Lutheran Church of San Jose, a nonprofit corporation (hereafter respondent), ordering appellants to refund to respondent $4,882.92 in tax moneys paid under protest. The issue on appeal is whether a tax-exempt owner of real property which leases the property to another tax-exempt organization may still qualify for the exemption from property taxes set forth in Revenue and Taxation Code section 214 (hereafter section 214).

Respondent is a nonprofit corporation which owns two parcels of real property, each improved with structures and facilities. Although respondent initially used both parcels of property, the congregation's use of the parcel and buildings at Foxworthy and Leigh Avenues (hereafter the Leigh Avenue property) began to lessen. In 1972, respondent leased the Leigh Avenue property to a nonprofit, tax-exempt religious organization, the Jewish Community Council of San Jose. The lease provided that the premises were to be used exclusively for a religious and charitable

---

*Assigned by the Chairperson of the Judicial Council.

purpose and that no other use would be permitted without permission of the lessor. The total rent over the five-year period was $50,000, payable in monthly installments of $833.33.

It was stipulated that at no time mentioned herein has any part of the net earnings of respondent or its predecessors inured to the benefit of any private shareholder or individual, and the subject property has not been used or operated by the owner so as to benefit any officer, director, member or other person associated with respondent through the distribution of profits. The fair rental value of the property is uncertain but is stipulated to be a sum not less than that required to be paid under the lease.

In fiscal year 1973-1974, respondent applied for and was granted tax-exempt status for the Leigh Avenue property pursuant to section 214 (hereafter also referred to as the welfare exemption). For fiscal year 1974-1975 appellant Mathiesen, in his official capacity as Assessor for Santa Clara County, fixed the assessed value of the property and its improvements at $34,780 and assessed a total tax against it of $4,603.70. Respondent again filed a claim for exemption for property taxes under section 214, but this time the claim was denied.

After being notified of the assessment, respondent paid the tax under protest and thereafter commenced the instant action for its recovery.

The trial court found in favor of respondent and granted judgment accordingly. In its findings of fact and conclusions of law, the court found specifically (a) the subject use of the property for and limited to "Jewish purposes," was an exclusive use of an exempt activity within the purview of section 214 and of the same kind and character to which respondent is irrevocably dedicated; under such circumstances the payment of money, whether characterized as "rent" or otherwise, is not material in determining whether the property qualifies for the welfare exemption, and (b) in the alternative, the amount paid by the Jewish Community Council to respondent was not intended by respondent to exceed its cost of making the property available for such exempt activity, and any "surplus" above cost was an unintended incident of the lease and not material in amount.

Appellants have filed the instant appeal, contending that under the facts of this case, the trial court interpreted section 214 erroneously.

Section 214 of the Revenue and Taxation Code, which was enacted pursuant to a constitutional enabling provision (Cal. Const., art. XIII, § 4, subd. (b)) provides, in pertinent part, as follows: "Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if: [¶] (1) The owner is not organized or operated for profit; provided, that in the case of hospitals, such organization shall not be deemed to be organized or operated for profit, if during the immediate preceding fiscal year the excess of operating revenues, exclusive of gifts, endowments and grants-in-aid, over operating expenses shall not have exceeded a sum equivalent to 10 percent of such operating expenses. As used herein, operating expenses shall include depreciation based on cost of replacement and amortization of, and interest on, indebtedness; [¶] (2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual; [¶] (3) The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose. . . ."

Appellants herein take two partially contradictory positions: First, they argue that property does not qualify for the welfare exemption where it is owned by one exempt organization and leased to another for the latter's own purposes; in other words, unity of ownership and operation is necessary in order to qualify under section 214. Secondly, they recognize "an exception" to the above rule where the owner leases the property to another exempt entity at a rental not exceeding the amount necessary to reimburse the owner for his cost of renting the property. Appellants maintain, however, that respondent has failed to qualify for this exception since its rental income did exceed its operating expenses.

It is unnecessary to treat appellants' first contention, as it is contrary to their position as stated in the pretrial conference order (see *Dell'Orto* v. *Dell'Orto* (1959) 166 Cal.App.2d 825, 830 [334 P.2d 97]), and the interpretation as promulgated by appellant Board of Equalization in its instructions to local tax assessors. However, because the issue is one of importance and will no doubt arise in the future, it will be addressed.

A. Does section 214 require ownership and operation of property by the same legal entity?

■ It is established that constitutional and statutory provisions granting exemption from taxation are to be strictly construed to the end that such concession will not be enlarged or extended beyond the plain meaning of the language employed. (*Cypress Lawn C. Assn.* v. *San Francisco* (1931) 211 Cal. 387, 390 [295 P. 813]; *Honeywell Information Systems, Inc.* v. *County of Sonoma* (1974) 44 Cal.App.3d 23, 27 [118 Cal.Rptr. 422].) "But the rule of strict construction does not require that the narrowest possible meaning be given to words descriptive of the exemption, for a fair and reasonable interpretation must be made of all laws with due regard for the ordinary meaning of the language employed and the object sought to be accomplished thereby. Strict construction must still be a reasonable construction." (*Honeywell Information Systems, Inc., supra,* 44 Cal.App.3d 23, 28, citations omitted.)

Article XIII, section 4 of the California Constitution, which provides authority for section 214, states that the Legislature may exempt from property taxation: ". . . (b) Property used exclusively for religious, hospital, or charitable purposes *and* owned or held in trust by corporations or other entities (1) that are organized and operating for those purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual." (Italics added.) Whereas some states rest the right to tax-exempt status exclusively upon the ownership of the property, and others strictly upon the use to which the property is put (see Annot. 157 A.L.R. 860, 861), California has chosen to require that both the ownership and the use of the property be under the auspices of religious, scientific, hospital or charitable purposes. ■ Thus, section 214 states that property used exclusively for welfare purposes is exempt from taxation if, inter alia, (1) the owner is not organized or operated for profit, (2) no part of the net earnings of the owner inures to the benefit of any private individual, and (3) "The property is used for the actual operation of the exempt activity . . . ." (§ 214, subds. (1)-(3).) Significantly, neither the statute nor the constitutional provision contain any language requiring that the owner and operator of the premises be the same entity. To the contrary, subdivision (3) of section 214, as originally enacted in 1945, set forth the requirement that "The property is not used or operated by the owner *or by any other person* for profit regardless of the purposes to which the profit is devoted." (Stats. 1945, ch. 241, § 1, p. 706.) Such wording indicated an implicit recognition by the Legislature that the owner may qualify for the exemption notwithstanding the fact that the property is used or occupied

by another person or entity.[1] ■ In interpreting a statute, a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) In determining such intent, we are required to look first to the words themselves for the answer, giving effect to the statute according to the usual, ordinary import of the language employed in framing it. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) In light of the background noted, we decline to infer an intent by the Legislature that the owner and operator of tax-exempt property be the same legal entity in order to qualify for the welfare exemption. A court is not at liberty to impute a particular intention to the Legislature where there is nothing in the language employed which implies such an intention. (*Struckman* v. *Board of Trustees* (1940) 38 Cal.App.2d 373, 376 [101 P.2d 151].)

Appellants point to the fact that section 214 grants the exemption to property used exclusively for welfare purposes which is *"owned and operated"* by corporations or foundations organized for such purposes as suggesting that unity of ownership and operation are necessary. But this provision merely reflects the dual constitutional requirements that the property must be both owned and operated by welfare organizations in order to qualify for the exemption. (Art. XIII, § 4, subd. (b).) It is reasonable to infer that had the Legislature wished to require any additional requirement that the owner of tax-exempt property also be its user, it would have so stated.

Appellants next claim that use of the word "the" in subdivision (3) of section 214, which requires that the property be used for "the exempt activity," logically refers to the activity of the owner. It is clear from reading the statute as a whole that *"the* exempt activity" refers to the activities described in the first clause of section 214, to wit, use of the property exclusively for "religious, hospital, scientific, or charitable purposes . . . ." This clause contains no qualification that such activity be engaged in by the owner. When used in a statute, words must be construed

---

[1]Appellants claim, without supporting authority, that the italicized language was inserted so as to close a "loophole" which would allow a licensee of an exempt organization to share possession with the owner and to turn a profit without losing tax-exempt status for the property. The logic of this position is elusive, especially in view of the fact that in the case appellants cite as typifying such a situation (*St. Francis Hosp.* v. *City & County of S.F.* (1955) 137 Cal.App.2d 321 [290 P.2d 275]), medical offices, a parking lot and a pharmacy which were adjunct to a tax-exempt hospital, were held *entitled* to turn a profit without affecting the exemptability of the main hospital building. (*Id.,* at p. 327.)

in their context, keeping in mind the nature and obvious purpose of the statute where they appear. (*Johnstone* v. *Richardson* (1951) 103 Cal.App.2d 41, 46 [229 P.2d 9].) When so viewed, appellants' contention that the Legislature should have used the words "an exempt activity" rather than "the exempt activity" if it intended to permit uses by one other than the owner, strains credulity and common sense.

Finally, appellants contend that the construction of section 214 upheld by the trial court would allow religious organizations to acquire large surplus land holdings and investment property without having to pay taxes on them, as long as it could lease the property to another exempt organization. It would be contrary to the legislative intent in adopting the welfare exemption, it is argued, to allow a welfare organization to pay off its mortgage "at the lessee's expense" while the property remains exempt from taxation.

█ It was never the intent of the statute or the constitutional provision to prohibit an exempt organization from conducting activities which produce an income over and above operating expenses, where such activities are not intentionally profit-making in nature and the income does not inure to the benefit of any private individual. (See *St. Francis Hosp.* v. *City & County of S.F., supra,* 137 Cal.App.2d 321, 324-327; *Sarah Dix Hamlin School* v. *City etc. of San Francisco* (1963) 221 Cal.App.2d 336, 341-342 [34 Cal.Rptr. 376].) Furthermore, the lease of real property by one religious or charitable organization to another satisfies the Legislature's fundamental purpose behind the welfare exemption, which is to provide an incentive for religious, charitable or scientific uses of real property: "[T]he overriding consideration of whether the property qualifies for exemption is the use of the property, and not the control over it." (*Honeywell Information Systems, Inc., supra,* 44 Cal.App.3d 23, 31; see also *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 239 [138 Cal.Rptr. 634].) Although each state's exemption statutes are worded differently, it is also noteworthy that the courts of Ohio and Illinois have recently upheld the exemptability of a lease arrangement such as that here presented. (*In re Application of Dana W. Morey Foundation* (1970) 21 Ohio App.2d 230 [256 N.E.2d 232]; *Children's Development Center, Inc.* v. *Olson* (1972) 52 Ill.2d 332 [288 N.E.2d 388].)

█ Therefore we hold that section 214 contains no requirement that the owner and operator of property exempt from taxation be the same legal entity.

B. Did respondent fail to qualify for a welfare exemption on the Leigh Avenue property if its rental income exceeded its cost of renting the property?

In a separate argument, appellants abandon their position that unity of ownership and use is required, and revert to their pretrial position, which is reflected in the "Assessors' Handbook" promulgated by appellant State Board of Equalization. According to the handbook, appellants recognize an "exception" to the requirement that the owner and operator be the same entity, where one exempt organization leases the property to another exempt entity and "the rent received by the lessor [does] not exceed cost. . . ." It is argued that respondent did not bring itself within this exception because the rent received from the Jewish Community Council exceeded respondent's cost of leasing the premises during the time period in question.

■ We believe that the "cost" exception as propounded by appellants is unsound under applicable law. Appellants state that this exception has a rational basis because the lease of property from one exempt organization to another at or below cost constitutes "a charitable use of the land by the owner." But the statute merely requires that the premises be used for religious, hospital, scientific *or* charitable purposes. (§ 214.) Where, as here, both the ownership and the use of the real property are exclusively devoted to religious purposes, the statutory provisions have been satisfied. To saddle the owner-lessor with an additional requirement that its use of the property must be "charitable" as well as religious, would impose an additional burden upon the property not contemplated by the Legislature.

It is now well settled that an exempt organization may conduct activities on its property which produce an operating surplus or unintended profit without affecting the exempt status of that property. As explained in the recent case of *Greek Theatre Assn.* v. *County of Los Angeles* (1978) 76 Cal.App.3d 768 [142 Cal.Rptr. 919] (hg. den. Mar. 30, 1978): "Prior to 1953, Revenue and Taxation Code section 214 contained, in subdivision (1), language equivalent to the present wording. It also contained in subdivision (3) language imposing the condition that: 'The property is not used or operated by the owner or by any other person for profit regardless of the purposes to which the profit is devoted. . . .' Our Supreme Court considered the qualification of hospital property for the welfare exemption under the pre-1953 version of section 214 where the

hospital was concededly operated to generate net profit sufficient to discharge a bonded indebtedness on its property. Stating that 'If subdivision three had been omitted, it might well be argued that the Legislature intended that the nonprofit conditions of subdivision one would be satisfied so long as none of the "net earnings" inured to the benefit of any private individual,' the high court determined that the presence of subdivision (3) compelled the conclusion that the operation of the hospital to generate a net profit to discharge the bonded indebtedness disqualified it from the welfare exemption. (*Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33, 38-39 [244 P.2d 390].) [¶] In 1953, the year following the Supreme Court's decision in *Sutter Hospital,* the Legislature amended Revenue and Taxation Code section 214 to eliminate the language used by the high court to deny the welfare exemption by reason of the generation of profit. (Deering's Cal. Codes Ann., Rev. & Tax. Code, § 214.) It reworded subdivision (3) to require that the property be 'used for the actual operation of the exempt activity.' " (*Id.,* at pp. 781-782.)

The 1953 amendment was clearly a legislative reaction to *Sutter Hospital's* interpretation of section 214 as requiring that the exempt activity not generate a profit. As stated in the urgency clause of the 1953 act: "It has never been the intention of the Legislature that the property of nonprofit religious, hospital or charitable organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies. . . ." (Stats. 1953, ch. 730, § 4, p. 1996; see West's Ann. Rev. & Tax. Code, § 214, Historical Note.)

The impact of this amendment was illustrated in *San Francisco Boys' Club, Inc.* v. *County of Mendocino* (1967) 254 Cal.App.2d 548 [62 Cal.Rptr. 294], where timber located upon real property owned by a boys' club and used as a summer camp was sold by the club to logging operators generating approximately $20,000 per year in income, all of which was devoted to the purposes of the club. (*Id.,* at pp. 549-551.) The county's attempt to withhold the welfare exemption for that portion of the property on which the logging operations were conducted was rebuffed by the trial court, and the Court of Appeal affirmed. After finding that all of the property was used for charitable purposes, the court rejected the notion that the profit made on the logging activity disqualified the property from receiving the exemption. The court stated that

after the 1953 amendment, "There was no longer any ban on profits resulting from the fees charged for charitable activities, which were to be devoted to the continued furnishing of those activities. 'Neither the Constitution nor the statute prohibits the earning of an operating surplus in the prudent management of exempt property, where no part of such earnings may inure to the benefit of any private shareholder or individual, or where as here, all of the property, including the operating surplus, is devoted to the exempt purposes for which the property is used. [Citations.]' (*Sarah Dix Hamlin School* v. *City & County of San Francisco, supra,* 221 Cal.App.2d 336, 341-342.)" (254 Cal.App.2d at p. 559.)

A review of the undisputed evidence concerning respondent's income and operating expenses reveals that any surplus of rental income above the cost of renting the property was unintended and not material in amount. It is unreasonable to suggest that respondent was compelled to show an operating deficit or zero balance in order to remain eligible for the welfare exemption. (See *St. Francis Hosp.* v. *City & County of S.F., supra,* 137 Cal.App.2d 321, 324-327.)

We therefore conclude that (1) under section 214 the owner and user of real property need not be the same legal entity; and (2) the fact that rental income may exceed operating expenses in a given year will not disqualify a tax-exempt lessor from receiving the welfare exemption on real property leased to another exempt organization where the property is exclusively used for exempt purposes and such leasing arrangement is not intentionally profit-making or commercial in nature.

The judgment is affirmed.

Caldecott, P. J., and Rattigan, J., concurred.

A petition for a rehearing was denied June 21, 1978, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied July 19, 1978.