Opinion
 

 FEINBERG, J.
 

 This is an appeal by the County of San Mateo, the county assessor, and the State Board of Equalization (County) from a judgment granting a property tax exemption under section 214 of the Revenue and Taxation Code (the welfare exemption) for property owned by the Peninsula Covenant Church (Church). The Church paid property taxes under protest for the years 1975-1976 and 1976-1977, and then brought an action to recover the taxes paid. The trial court concluded that it was entitled to the welfare exemption and awarded a refund of taxes paid for those years. On appeal, the County contends that the property does not qualify for the welfare exemption because it is not used exclusively for religious or charitable purposes as required by section 214.
 

 The Church is a nonprofit corporation which has existed in Redwood City since 1951. It is a member of the Evangelical Covenant Church of America. Its property consists of two contiguous parcels which are separately assessed. One consists of 9.40 acres, upon which its welfare exemption was allowed, and a second, the subject of this appeal, consists of 2.64 acres, upon which the claim was denied.
 

 
 *388
 
 The disputed property was formerly a swim and tennis club. It consists of a building known as the Covenant Community Center, a swimming pool, parking lots, five tennis courts, and a playground for a church preschool. The building contains 6 meeting rooms which hold respectively 150, 60, 45, 25, 25 and 15 persons. There is a central reception and office area which contains the working spaces of the center’s receptionist and director. That area also houses a small book store; 90 percent of the books sold there are religious in nature; the remaining 10 percent are sports books. Some tennis equipment is also sold, above wholesale cost but at a price slightly lower than that in local retail stores. The tennis equipment does not occupy space that is not already used for office and reception area purposes. The building also has locker room areas for men and women, and a sauna.
 

 The Church first considered purchasing the parcel in 1971 because the size of its congregation was increasing and it needed more parking space for its worship facility. The Church concluded that the entire parcel should be purchased, since it would provide an additional facility for the educational and community service activities of the Church. At about the time the parcel was acquired, the building which had been used as the Church’s classroom building was razed, and there was an immediate need for more classroom facilities. The idea of constructing a gymnasium for church-sponsored athletics was rejected in favor of retaining the existing swimming and tennis facilities. The congregation adopted a statement of policy based on the Church constitution, regarding the use which was to be made of the new facility: “[T]he new facility will be utilized for Christian nurture of individuals and families within the Church and for the extension of the gospel through our Christian ministiy to others in the community.” The policy statement further provided that planned Church programs would have priority over informal uses of the facility, and that the Church would seek to defray the cost of the facility through donations, particularly from those who used the facility.
 

 The community center is directed by an ordained minister who is a member of the Church’s pastoral staff, and who was hired specifically to organize and direct the center. It is governed by the various governing boards of the Church and is in no way independent of the Church. The director’s staff members are all affiliated with the Church; the summer recreation directors all have religious training and direct the church-related youth activities as well as the recreational activities.
 

 
 *389
 
 The community center building itself serves a variety of functions. It is used on Sundays for Church school classes. During the week a number of Church-sponsored groups for children, high school and college students, and adults hold meetings at the center; the meetings typically include both religious study and recreational or social activities. The participants in the youth programs of the Church include both Church members and non-Church members from the community.
 

 In addition, the center houses Retarded Adult Training Program classes, and Operation Help, which provides free food and clothing for the poor. Respondent gives occasional free use of the-facilities to the Girl Scouts, the 4-H Club, and various religious groups.
 

 The recreational facilities—that is, the swimming pool, tennis courts, locker room and sauna—are used both by Church members and by members of an organization known as the Peninsula Covenant Church “Boosters.” The Boosters program was begun partly in response to community leaders’ requests to open the facilities to the public, since the area did not have adequate recreational facilities. Boosters pay initial nonrefundable registration fees of $200, and monthly fees of $25 (for an individual membership) or $30 (for a family membership). The use permit limits the number of people using the facility to 300; the actual Booster membership at the time of trial was about 265. There are no membership qualifications other than payment of the membership fees. Although at one time there was a brief waiting list for membership, all those who have applied have been offered membership. Boosters are allowed to bring one guest at a time for a nominal fee, but no particular guest may come more than once a month. The Boosters have no social functions other than those sponsored by the Church.
 

 Boosters have access to the recreational facilities of the community center six and a half days per week. The general rule regarding priority of use is stated in the Covenant Community Center’s brochure: “When an occasional church activity pre-empts a given time span, adequate notice will be given to all Boosters. At times also, members of the Church who are not Boosters will be allowed to use the facility for limited hours. In tennis especially, Boosters shall have general priority.”
 

 The swimming pool and tennis courts are sometimes used in connection with the recreational activities of the Church groups which meet during the week. The swimming pool is also used by the Church’s
 
 *390
 
 swimming team, and is open for informal use by Church members three times a week. It has been used twice for baptisms. The pool is heated and is open year-round. The tennis courts have been used once for a dramatic production of a religious nature.
 

 The parking lots are used by Boosters and by Church members. The evidence does not indicate the relative use of the parking lots by the two groups.
 

 Each prospective member of the Boosters must meet with the director of the center, who gives them a pamphlet describing the community center, explains the beliefs of the Church, and asks the applicant about his or her own religious beliefs. He explains to each applicant that the Church’s planned programs have priority in the use of the facility. However, Boosters are the principal users of the tennis courts, and are given priority over informal use by Church members, even if the Church members are also Boosters. After the initial interview, the director spends time with the Boosters in social activities and tennis, and invites them to Church functions.
 

 An unspecified number of Church members have become Boosters. A few Boosters have become members of the Church. A number of children who are Boosters members are involved in the Church’s youth activities. Boosters donate some of the clothing for Operation Help. The community center director organized one tennis tournament which consisted of doubles teams each made up of one Booster member and one Church member; 70 people participated.
 

 Two of the Church’s pastors testified that the Boosters organization serves two distinct religious purposes for the Church: evangelism, and service to the community. They testified that the informal contacts established with people through activities such as the Boosters’ use of the swimming pool and tennis courts were an important part of their evangelical mission; and that providing recreational facilities to the community was a way of serving the community in which the Church exists, wholly apart from the evangelical purposes.
 

 An expert witness, a minister and professor of social ethics at the Graduate Theological Union in Berkeley, testified that the institutional church has historically conducted athletic and recreational activities for its members, in addition to formal worship and religious study as a way of
 
 *391
 
 teaching religious and ethical attitudes. He further stated that the increased leisure time available to people in modem society has led to expansion of church-related activities to fill that leisure time, and that this is necessary to keep the church from becoming a formalistic institution. He was also of the opinion that the Boosters’ membership was an important part of the evangelical activity of the Church, citing examples of ways in which significant religious instruction or personal counseling develops from informal relationships with church ministers.
 

 Standard of review.
 

 We first consider the proper standard of review on appeal. The County contends that we must conduct an independent review of the evidence, since the facts upon which the trial court’s decision was based are uncontradicted. The cases which have applied this standard of review were submitted on stipulated facts, occasionally supplemented by oral or documentary evidence.
 
 (Western Contracting Corp.
 
 v.
 
 State Board of Equalization
 
 (1968) 265 Cal.App.2d 568, 575 [71 Cal.Rptr. 472];
 
 Bank of America
 
 v.
 
 State Bd. of Equal.
 
 (1962) 209 Cal.App.2d 780, 793 [26 Cal.Rptr. 348]). In such cases, where the only question is one of law, the appellate court may conduct an independent review of the evidence. However, where there are conflicts in the evidence introduced, the substantial evidence rule still applies to review of the factual findings of the court.
 

 Here, the trial court’s decision was based on the testimony of the Church’s three witnesses and on documentaiy evidence introduced by respondent. To some extent, the County does question the factual findings of the trial court as, for example, the extent of the Boosters’ use of the community center building. On such an issue, the evidence will be reviewed to determine if there is substantial evidence in the record to support the finding. For the most part, however, the facts are not in dispute, and the arguments on appeal relate to whether the established facts justify the legal conclusions underlying the decision that respondent is entitled to a welfare exemption for the property. To the extent that the facts do not support the legal conclusions of the trial court, it goes without saying that this court may independently review the evidence and make its own determination on appeal.
 

 
 *392
 

 Statutory Provisions
 

 Section 214 of the Revenue and Taxation Code provides in pertinent part: “Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by . . . foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:
 

 “(3) The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose;
 

 “(5) The property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes except where such use is clearly incidental to a primary religious, hospital, scientific, or charitable purpose; . . .”
 

 The welfare exemption, like all tax exemption statutes, is to be strictly construed to the end that the exemption allowed is not extended beyond the plain meaning of the language employed. However, the rule of strict construction does not mean that the narrowest possible interpretation be given; “ ‘strict construction must still be a reasonable construction.’ ”
 
 (Cedars of Lebanon Hosp.
 
 v.
 
 County of L.A.
 
 (1950) 35 Cal.2d 729, 734-735
 
 [221 P.2d
 
 31, 15 A.L.R.2d 1045];
 
 English
 
 v.
 
 County of Alameda
 
 (1977) 70 Cal.App.3d 226, 234 [138 Cal.Rptr. 634]).
 

 The County contends that the property is not entitled to an exemption because its primary use is as a social club in violation of section 214, subdivision (5), and that any religious use of the property is incidental to its social and recreational use by the Boosters. It further argues that such a use of the property is not a charitable or religious purpose within the meaning of section 214. The Church’s position is that the Boosters’ use of the property serves religious purposes by helping to further the Church’s evangelical activities and by providing recreational activities for the community. We shall consider each portion of the property separately. Because the record indicates that the locker rooms and sauna located in the community center building are essentially used in conjunction with
 
 *393
 
 the tennis courts and swimming pool, we will treat that part of the building with the tennis courts and swimming pool.
 

 (1)
 
 Community Center Building (Including Church Preschool, Excluding Locker Rooms and Sauna)
 

 The community center building itself is entitled to the welfare exemption, since the evidence establishes clearly that it is used primarily as a center for the Church’s various religious study and recreational groups, and for the administrative and religious work of one of its ministers.
 

 It can hardly be questioned that property is used for a religious purpose when it is used daily by a variety of church groups which engage in organized programs of religious study, prayer, and recreational or social activity. As the uncontradicted testimony at the trial established, such activities have long been considered a traditional function of churches, and are seen as an essential part of religious instruction; they help make the church a significant part of people’s lives.
 

 The reception area is used as an office by a minister and his assistant in the performance of the ministerial duties of the church, and it also contains religious and some sports books for sale. Property used by a minister for his daily work is certainly incidental and reasonably necessary for the accomplishment of the church’s religious purposes. Furthermore, a small religious book store which serves church members and which does not operate at a profit is incidental and reasonably necessary to the accomplishment of religious purposes. A church exists, among other things, to instruct its members in theology, ethics, religious history and ritual. To provide books to complement church worship services and religious instruction may be an important means of accomplishing these aims. In addition, the books are located in an area which is primarily devoted to and necessary for the work of one of the pastors. Such property clearly comes within the requirements of section 214.
 

 The exemption for the community center building is not destroyed by the fact that some of the Boosters may occasionally use the center for an informal luncheon or for playing cards, since testimony at trial clearly established that such use was infrequent. The exclusive use requirement
 
 *394
 
 does not foreclose some additional or complementary use on the part of certain authorized private individuals.
 
 (English
 
 v.
 
 County of Alameda, supra,
 
 70 Cal.App.3d 226, 236.) The evidence in this case indicates that the Boosters’ use of these exempt areas of the community center is minimal compared to the use by church staff and members for religious purposes.
 

 (2)
 
 The Swimming Pool, Tennis Courts, Locker Rooms and Sauna
 

 On the other hand, the recreational facilities are not exempt under section 214. We base this conclusion on two grounds. First, the statute requires that a property be used exclusively for an exempt purpose. While we do not purport to define the exact limits of this requirement, we conclude that, at the very least, exclusive use must mean that the property is used
 
 primarily
 
 for exempt purposes. While respondent’s use of these facilities for church members arguably might be exempt as complementary to a religious purpose, the Boosters, not the Church, are the primary users of the facilities. Second, we conclude that this primary use of the property is recreational, not evangelistic, and that the nature of the Boosters organization is not charitable.
 

 The Church’s ministers and expert witness testified that one function of organized churches is to promote religious attitudes in all aspects of a church member’s life. Athletic and recreational activities which are sponsored by a church as part of a program designed to reach beyond the hours of formal religious worship may thus be considered proper religious purposes. Furthermore, evangelism is á traditional function of many churches. Thus, a church might sponsor various activities on its grounds which were designed specifically to acquaint nonchurch members with its beliefs and practices,' and which would encourage members of the community to seek personal counseling and religious instruction. Finally, churches have traditionally undertaken to provide services to their communities analogous to those provided by nonreligious charitable institutions. A church might house senior citizens’ centers, provide clothing and food to the needy, or run an elementary school, even if such activities are not accompanied by religious worship or proselytization. On the other hand, if the property is used for noncharitable purposes, or is organized in such a way that it is essentially comparable to commercial activity, it will not be exempt simply because it is owned and operated by a church rather than by a private club.
 

 
 *395
 
 (a)
 
 Use by church members.
 
 Testimony and evidence introduced at trial indicated that the swimming pool and tennis courts are occasionally used in conjunction with organized church groups.
 

 For instance, each Monday afternoon, a church group for young girls meets and may use the swimming pool or tennis courts. On Tuesday afternoons, a college-career group meets for a varied program of religious study and recreation. Similar groups which also make occasional use of the recreational facilities meet every Wednesday and Thursday afternoon. On Thursday mornings, the church sponsors a group called “Executive Tennis” which includes “early morning tennis and Christian discussion.” For several weeks in the summer, a more extensive youth program is held at the church. The pool is open to church members for informal use three days a week. While the pastor suggested that there may have been instances where people were allowed to use the pool and tennis courts, although they could not afford to join the Boosters, no specific examples were given. The Church swim team uses the pool; the record does not indicate how often it is used by the team. And the swimming pool and tennis courts have been used a total of three times for religious programs: two baptisms and a religious-dramatic presentation. The locker rooms are used in conjunction with the recreational use of the swimming pool and tennis courts. Whenever a Booster requests to be assigned a locker, a locker is assigned. The unassigned lockers are available for use by Boosters or church members. Presumably, the relative use of the locker rooms by Boosters and by church members is comparable to the relative use of the tennis courts and swimming pool.
 

 If these activities were the only use made of the recreational facilities, or if they were clearly the primary use, we would be inclined to affirm the trial court’s decision. Churches frequently hold recreational activities in conjunction with religious worship or study groups. The fact that in this case the recreation takes the form of swimming or tennis does not make it less amenable to fulfillment of this religious purpose than if the group were to play volleyball in an open field or basketball in a church-owned gymnasium.
 

 But section 214 requires that property must be “exclusively used” for an exempt purpose to qualify for the tax exemption. Because the state views the activities of charitable organizations favorably, the “exclusive use” requirement has not been interpreted to mean that any ancillary use of the property will destroy its exempt status. Thus, it has been held that
 
 *396
 
 certain property held by a religious group and used in conjunction with its religious activities was exempt even though the property was
 
 occasionally
 
 used by other organizations, and for dances, dinners, and meetings held by the respondent religious group.
 
 (Fellowship of Humanity
 
 v.
 
 Co. Alameda
 
 (1957) 153 Cal.App.2d 673 [315 P.2d 394].) And, as suggested above in the discussion of the community center, the exclusive use requirement does not foreclose some additional or complementary use on the part of certain authorized private individuals.
 
 {English
 
 v.
 
 County of Alameda, supra,
 
 70 Cal.App.3d 226, 236.)
 

 The word “exclusively” as used in section 214 generally means “solely.” (See Webster’s Third New Internat. Dist. (1965) p. 793.) While the courts have not defined “exclusive use” in such a restrictive manner, we believe that the clear meaning of section 214 is that at the very least the exempt purpose must be the
 
 primary
 
 use made of the property, and that any ancillary use must be incidental to that primary use. That this is the proper interpretation of the statute is supported by the language of subdivision (5) of section 214, which contemplates use of property for fraternal or lodge purposes only when they are “clearly incidental to a primary religious ... or charitible purpose.”
 

 The record in this case fairly indicates that church-organized activities do not constitute the primary use of the recreational facilities. While the church groups use them at the most on weekday afternoons, the Boosters are free to use the facilities virtually without exception six and one-half days a week. And, since Boosters have general priority on the tennis courts, their use of the courts in fact appears to preempt use by church members, rather than vice versa. Thus, the property would be exempt only if the Boosters’ use of the premises constituted a religious or charitable purpose.
 

 (b)
 
 Use by Boosters.
 
 First, the Church contends that making the premises available to Boosters, most of whom are not Church members, is a way in which it seeks to fulfill its evangelistic purpose. To qualify for the exemption, the Church would have to show that the use is “incidental to and reasonably necessary for” the accomplishment of this purpose.
 
 (Cedars of Lebanon Hosp.
 
 v.
 
 County of L.A., supra,
 
 35 Cal.2d 729, 736 [221 P.2d 31, 15 A.L.R.2d 1045].) "(7) Furthermore, that respondent
 
 intended
 
 the properly to advance its evangelistic objectives is not enough to qualify for the exemption. “Actual use [of property for a religious
 
 *397
 
 purpose] and not intended use is the criteria [s/c] for exemption.”
 
 (Christward Ministry
 
 v.
 
 County of San Diego
 
 (1969) 271 Cal.App.2d 805, 811 [76 Cal.Rptr. 854].)
 

 The evidence does not support a conclusion that a swimming pool, five tennis courts and locker rooms are reasonably necessary for the accomplishment of respondent’s evangelistic mission, or that the property is primarily used for that purpose. While the availability of one minister during the hours the Boosters use the premises theoretically provides an opportunity for religious instruction and counseling, there was no evidence to indicate that any substantial proportion of that minister’s time is actually spent in evangelical activities with the Boosters. Although the minister meets with each Booster applicant and explains the beliefs of the church, there is apparently little or no further contact of this nature with most Boosters. While the respondent’s witnesses testified that such informal contacts as may be formed by the Boosters organization
 
 may
 
 lead to religious discussion and personal counseling, the Church could point to only two or three instances in which this had actually occurred. To uphold the exemption on the ground that the Boosters’ use constitutes fulfillment of a religious purpose would unreasonably expand the scope of the religious exemption. If such limited and indirect proselytization could support an exemption, then it seems that a church could also operate a grocery store or a restaurant in a manner indistinguishable from a private entrepreneur and be tax-exempt so long as it placed informational and religious pamphlets at the entrance to the building. While an evangelistic purpose may to some extent be served by the Boosters organization, use of the swimming pool and the tennis courts for that purpose is clearly incidental to the nonreligious social and recreational uses of the property.
 

 The Church also contends that the Boosters organization serves the traditional religious purpose of service to the community. As the Church observes in its brief on appeal, this concept of community service is essentially synonymous with the exemption for “charitable purposes” under section 214.
 

 The United States Supreme Court, in upholding the constitutionality of a property tax exemption for religious organizations in New York, described the basic theory underlying such exemptions by stating that New York, along with other states, “has determined that certain entities that exist in a harmonious relationship to the community at large, and
 
 *398
 
 that foster its ‘moral or mental improvement,’ should not be inhibited in their activities by property taxation. . . . The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest.”
 
 (Walz
 
 v.
 
 Tax Commission
 
 (1969) 397 U.S. 664, 672-673 [25 L.Ed.2d 697, 703-704, 90 S.Ct. 1409].) This theory has found expression in California in the definition given a “charitable purpose” under section 214. The California Supreme Court has stated that to be considered a charitable purpose, the activity must “benefit the community as a whole or an unascertainable and indefinite portion thereof.”
 
 (Stockton Civic Theatre
 
 v.
 
 Board of Supervisors
 
 (1967) 66 Cal.2d 13, 22 [56 Cal.Rptr. 658, 423 P.2d 810].) The range of benefits which may be considered charitable is, of course, difficult to define. The court in
 
 Fredericka Home
 
 v.
 
 County of San Diego
 
 (1950) 35 Cal.2d 789, 793 [221 P.2d 68], noted that the word “charity” does not refer only to aid to the poor and destitute, but may include humanitarian activities which are maintained to care for the physical and mental well-being of the recipients. Another theory behind the exemption is that the state will ultimately profit by encouraging those private organizations to provide services, such as hospitals and schools, which the government would otherwise be required to provide for the community. (Note,
 
 Exemption of Educational, Philanthropic and Religious Institutions from State Real Property Taxes
 
 (1950) 64 Harv.L.Rev. 288; see, e.g.,
 
 Fifield Manor
 
 v.
 
 County of Los Angeles
 
 (1961) 188 Cal.App.2d 1, 11 [10 Cal.Rptr. 242];
 
 Sarah Dix Hamlin School
 
 v.
 
 City etc. of San Francisco
 
 (1963) 221 Cal.App.2d 336, 341 [34 Cal.Rptr. 376].) Under either of these tests, it is possible that an increasing array of activities may be considered charitable, and therefore exempt, under section 214. Indeed, the court in the
 
 Stockton Civic Theatre
 
 case concluded that the definition was sufficiently broad to include community theatres.
 
 [1]
 
 Because this definition of charity as benefiting the community as a whole by serving humanitarian goals clearly contemplates something more than “the relief of the poor and destitute,” a number of organizations have been found to be exempt despite the presence of facts which under the older, more restrictive view would preclude their characterization as charitable. Thus, for example, a charitable purpose may exist despite the fact that an organization charges for the use of its property, so long as such costs are used solely to help defray the costs of operation of the
 
 *399
 
 exempt activity and the property is used in connection with an exempt purpose.
 
 (Y.M.C.A.
 
 v.
 
 County of L.A.
 
 (1950) 35 Cal.2d 760, 771-772 [221 P.2d 47].) Indeed, even if the activity benefits primarily the well-to-do, it may be exempt if it “extend[s] to . . . areas where [the well-to-do] are not able to care for themselves” or “extends to those social objectives which promote the general welfare and would be served by the government in the absence of philanthropic enterprises such as homes for the aged.”
 
 (Fifield Manor
 
 v.
 
 County of Los Angeles, supra,
 
 188 Cal.App.2d at p. 11.) A charitable purpose may exist, even though the use of the property is limited to a certain number of people and is generally open only to those who can afford to pay, if its services relieve the government of a burden it would otherwise be required to carry, such as an elementary or high school.
 
 (Sarah Dix Hamlin School
 
 v.
 
 City etc. of San Francisco, supra,
 
 221 Cal.App.2d 336.) Furthermore, an activity has been held exempt as a charitable purpose where its educational and cultural benefits extend to a broad segment of the community.
 
 (Stockton Civic Theatre
 
 v.
 
 Board of Supervisors, supra, 66
 
 Cal.2d 13;
 
 Greek Theatre Assn.
 
 v.
 
 County of Los Angeles, supra,
 
 76 Cal.App.3d 768.)
 

 From these decisions, two dependent variables emerge as particularly important to the determination of the court: the nature of the use of property, and the degree to which the activity is open to the community as a whole. If the use is one which is deemed particularly necessary to the welfare of the community or is a service which the government otherwise would be compelled to provide for the community, such as a hospital or elementary school, it may be considered a charitable purpose even though only a small number of people are directly benefited.
 
 (Fredericka Home
 
 v.
 
 County of San Diego, supra,
 
 35 Cal.2d 789;
 
 Sarah Dix Hamlin School
 
 v.
 
 City etc. of San Francisco, supra,
 
 221 Cal.App.2d 336, 341.) If, on the other hand, the activity serves educational or humanitarian goals and is open to all or virtually all of the community, it may be exempt even though it is not a necessary activity in the same sense as a hospital, and even though there are significant collateral benefits, such as amusement and entertainment.
 
 (Stockton Civic Theatre
 
 v.
 
 Board of Supervisors, supra, 66
 
 Cal.2d 13;
 
 Greek Theatre Assn.
 
 v.
 
 County of Los Angeles, supra,
 
 76 Cal.App.3d 768.)
 

 But the situation presented in this case is of an entirely different sort from any of the examples discussed above. Here, the Church has provided recreational facilities for a limited number of people in the community in return for a substantial membership fee which covers, it
 
 *400
 
 appears, the entire operating cost of the facility. These facilities are not open to the public, or even to the paying public; poor people have little or no access to them unless they belong to the Church, and even then their access would be restricted to certain hours of the week. The Church in this case essentially is doing the same thing that its predecessor in title to the property had been doing: operating a swim and tennis club. This situation is distinguishable from other cases involving payments by the recipients of charitable activities, because in those cases the payments made by individuals using the facilities were usually supplemented by community chest funds or the like, and the benefit granted was greater than the cost incurred by the individual. (See, e.g.,
 
 Y.M.C.A.
 
 v.
 
 County of L.A., supra,
 
 35 Cal.2d 760, 771;
 
 Fredericka Home
 
 v.
 
 County of San Diego, supra,
 
 35 Cal.2d 789, 791.) But “self-help is not charity.” (Comment,
 
 What is Charity?—Recreational Community Centers
 
 (1976) 54 Can.Bar Rev. 784, 788.) We do not hold that recreational and athletic facilities such as these are necessarily noncharitable, for they can undoubtedly contribute to the well-being of the community. Facilities which provide the opportunity for varied forms of athletic activity might well come within the definition of a “charitable purpose,” for they tend to improve the quality of life in a community. But where the direct benefit is reaped by only a very few members of the community who pay for it, as here, and is not a service particularly necessary to the community, one that otherwise the government would have to provide, the property cannot be considered to be used for charitable purposes.
 

 The portions of the Church’s property occupied by the swimming pool, tennis courts, and locker rooms of the community center building are, therefore, not exempt under section 214.
 

 (3)
 
 Parking Lots
 

 Church-owned parking lots, whether or not located on or near the worship facility, are granted a tax exemption under section 206.1 of the Revenue and Taxation Code. Section 206.1 provides: “All real property necessarily and reasonably required for the parking of automobiles of persons while attending religious services, or engaged in religious services or worship, or engaged in any religious activity, or a possessory interest in such real property, if such real property is leased by a church or religious denomination or sect from a governmental entity, whether or not the real property is contiguous to the land on which is erected the church or other structure used for the religious service or as
 
 *401
 
 the place of worship or religious activity and which real property or possessory interest is owned by the church or religious denomination or sect using such real property for the parking of automobiles as aforesaid, and which real property or possessory interest is not at other times used for commercial purposes is exempt from taxation. As used in this section, ‘commercial purposes’ does not include the parking of vehicles or bicycles, the revenue of which does not exceed the ordinary and necessary costs of operating and maintaining the property for parking purposes.”
 

 The requirement of exclusive use appears to be absent for church parking lots. The statute originally read: “All real property necessarily and reasonably required
 
 and exclusively used
 
 for the parking of automobiles of persons while attending religious services ... is exempt from taxation.” (Italics added.) The phrase “and exclusively used” was deleted from the statute by 1978 amendments (Stats. 1978, ch. 866, § 1). The focus thus seems to be on the noncommercial nature of the parking lot and its being “necessarily and reasonably required” for parking. The Church has established the exempt status of the portion of the property occupied by parking lots. The witnesses testified without contradiction that the original reason for the acquisition of the property was to meet a critical need for parking for people attending the Church’s worship services. The parking lots are used by those attending regular worship services and the daily meetings of church groups. They serve no commercial purpose; while the record does not indicate whether the church-goers or Boosters are the primary users of the parking lots, that determination apparently need not be made under the statute. It is enough that the parking lots are noncommercial, and are necessarily and reasonably required by the church. That portion of the property was properly held exempt.
 

 The judgment as to the community center building, excluding the locker room and sauna areas, and the parking lots, is affirmed. It is reversed as to the tennis courts, swimming pool, locker rooms and sauna areas, and remanded for further proceedings not inconsistent with this opinion. Each party to bear its own costs.
 

 Scott, Acting P. J., and Halvonik, J., concurred.
 

 A petition for a rehearing was denied July 25, 1979.
 

 [1]
 

 But the result has been criticized.
 
 (Greek Theatre Assn.
 
 v.
 
 County of Los Angeles
 
 (1978) 76 Cal.App.3d 768, 784 [142 Cal.Rptr. 919]; Comment,
 
 The California Welfare Exemption
 
 (1968)41 So.Cal.L.Rev. 844.)