[No. C011614. Third Dist. July 20, 1992.]

RIDEOUT HOSPITAL FOUNDATION, INC., Plaintiff and Respondent, v. COUNTY OF YUBA et al., Defendants and Appellants.

216

## Counsel

Daniel G. Montgomery, County Counsel, and James W. Calkins, Chief Deputy County Counsel, for Defendants and Appellants.

McCutchen, Doyle, Brown & Enersen, John R. Reese and Gerald R. Peters for Plaintiff and Respondent.

## Opinion

DAVIS, J.—In this action to recover property taxes paid under protest, County of Yuba (County) appeals from a decision in favor of the taxpayer, Rideout Memorial Hospital (Rideout). There is but one issue on appeal: can a nonprofit hospital that earned surplus revenue in excess of 10 percent (for a given year) still qualify for the "welfare exemption" from property taxation in light of Revenue and Taxation Code section 214, subdivision (a)(1)? We hold that it can.

### Background

Revenue and Taxation Code section 214 (section 214) sets forth the "welfare exemption" from property taxation. For the tax years in question

here, the section provided in pertinent part: "(a) Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:

"(1) The owner is not organized or operated for profit; provided, that in the case of hospitals, such organization shall not be deemed to be organized or operated for profit, if during the immediate preceding fiscal year the excess of operating revenues, exclusive of gifts, endowments and grants-in-aid, over operating expenses shall not have exceeded a sum equivalent to 10 percent of such operating expenses. As used herein, operating expenses shall include depreciation based on cost of replacement and amortization of, and interest on, indebtedness.

"(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual.

"(3) The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose.

"(4) The property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder, member, employee, contributor, or bondholder of the owner or operator, or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession.

"(5) The property is not used by the owner or members thereof for fraternal or lodge purposes, or for social club purposes except where such use is clearly incidental to a primary religious, hospital, scientific, or charitable purpose.

"(6) The property is irrevocably dedicated to religious, charitable, scientific, or hospital purposes and upon the liquidation, dissolution or abandonment of the owner will not inure to the benefit of any private person except a fund, foundation or corporation organized and operated for religious, hospital, scientific, or charitable purposes. . . .

"The exemption provided for herein shall be known as the 'welfare exemption.' "

Our concern centers on section 214, subdivision (a)(1) (hereafter, section 214(a)(1)).[1]

County denied Rideout's applications for the welfare exemption for the tax years 1986-1987 and 1987-1988. Rideout paid the taxes under protest and applied for a refund. After County denied the refund, Rideout sued County.

County contends that Rideout had excess revenues, under section 214, of 24 and 21 percent for the two years in question. Rideout concedes that its net operating revenues under section 214 exceeded 10 percent in each of those two years.

In summary judgment proceedings, the parties narrowed the issues to the single issue stated above and the trial court ruled in favor of Rideout. County argues that Rideout is *automatically* ineligible for the welfare exemption for the years in question because its net revenues exceeded the 10 percent limitation of section 214(a)(1). Rideout counters that the 10 percent provision constitutes a "safe harbor" for nonprofit hospitals by which the hospital can be deemed to satisfy section 214(a)(1), but that a nonprofit hospital with revenues over 10 percent can still meet the condition of section 214(a)(1) by showing, pursuant to the general rule, that it is not organized or operated for profit. We conclude that Rideout's position is essentially correct.

## DISCUSSION

 The issue in this case presents a question of law that we consider independently. (See *Rudd* v. *California Casualty Gen. Ins. Co.* (1990) 219

[1]Section 214(a)(1) was amended nonsubstantively in 1989 and now provides: "(a) Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if: [¶] (1) The owner is not organized or operated for profit. However, in the case of hospitals, the organization shall not be deemed to be organized or operated for profit, if during the immediate preceding fiscal year the excess of operating revenues, exclusive of gifts, endowments and grants-in-aid, over operating expenses has not exceeded a sum equivalent to 10 percent of those operating expenses. As used herein, operating expenses shall include depreciation based on cost of replacement and amortization of, and interest on, indebtedness." (Stats. 1989, ch. 1292, § 1.)

In 1985, the previously undesignated introductory paragraph of section 214 was lettered "(a)." (Stats. 1985, ch. 542, § 2, p. 2026.) This change redesignated section 214(1) as 214(a)(1), section 214(2) as 214(a)(2), and so on. For the sake of simplicity we will use the terms "section 214(a)(1)" "section 214(a)(2)" and the like when referring to the pre- or the post-1985 section 214.

Cal.App.3d 948, 951-952 [268 Cal.Rptr. 624]; *Burke Concrete Accessories, Inc.* v. *Superior Court* (1970) 8 Cal.App.3d 773, 774-775 [87 Cal.Rptr. 619].)

All property in California is subject to taxation unless exempted under federal or California law. (Cal. Const., art. XIII, § 1; Rev. & Tax. Code, § 201; all further references to undesignated sections are to the Revenue and Taxation Code unless otherwise specified.) The constitutional basis for the "welfare exemption" was added to the California Constitution in 1944; as revised nonsubstantively in 1974, it now provides: "The Legislature may exempt from property taxation in whole or in part: [¶] . . . Property used exclusively for religious, hospital, or charitable purposes and owned or held in trust by corporations or other entities (1) that are organized and operating for those purposes, (2) that are nonprofit, and (3) no part of whose net earnings inures to the benefit of any private shareholder or individual." (Cal. Const., art. XIII, § 4, subd. (b); formerly art. XIII, § 1c.) The rationale for the welfare exemption is that the exempt property is being used either to provide a government-like service or to accomplish some desired social objective. (Ehrman & Flavin, Taxing Cal. Property (3d ed. 1989) Exempt Property, § 6.05, p. 9.)

Pursuant to this constitutional authorization, the Legislature in 1945 enacted section 214 and labeled that exemption the "welfare exemption." In this appeal, we are asked to interpret subdivision (a)(1) of section 214.

Certain general principles guide our interpretation. ■ "Our function is to ascertain the intent of the Legislature so as to effectuate the purpose of the law. (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856].) To ascertain such intent, courts turn first to the words of the statute itself (*ibid.*), and seek to give the words employed by the Legislature their usual and ordinary meaning. (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) When interpreting statutory language, we may neither insert language which has been omitted nor ignore language which has been inserted. (Code Civ. Proc., § 1858.) The language must be construed in the context of the statutory framework as a whole, keeping in mind the policies and purposes of the statute (*West Pico Furniture Co.* v. *Pacific Finance Loans* (1970) 2 Cal.3d 594, 608 [86 Cal.Rptr. 793, 469 P.2d 665]), and where possible the language should be read so as to conform to the spirit of the enactment. (*Lungren* v. *Deukmejian, supra,* 45 Cal.3d at p. 735.)" (*Rudd* v. *California Casualty Gen. Ins. Co., supra,* 219 Cal.App.3d at p. 952.) If the statute is ambiguous or uncertain, courts employ various rules of construction to assist in the interpretation. (See 58 Cal.Jur.3d, Statutes, §§ 82-118,

pp. 430-508.) ■ Finally, "[t]he welfare exemption, like all tax exemption statutes, is to be strictly construed to the end that the exemption allowed is not extended beyond the plain meaning of the language employed. However, the rule of strict construction does not mean that the narrowest possible interpretation be given; ' "strict construction must still be a reasonable construction." ' (*Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729, 734-735 [221 P.2d 31, 15 A.L.R.2d 1045]; *English* v. *County of Alameda* (1977) 70 Cal.App.3d 226, 234 [138 Cal.Rptr. 634].)" (*Peninsula Covenant Church* v. *County of San Mateo* (1979) 94 Cal.App.3d 382, 392 [156 Cal.Rptr. 431].)

■ We therefore first consider the language of section 214(a)(1), which stated at the relevant times herein: "(a) Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if: [¶] (1) The owner is not organized or operated for profit; provided, that in the case of hospitals, such organization shall not be deemed to be organized or operated for profit, if during the immediate preceding fiscal year the excess of operating revenues, exclusive of gifts, endowments and grants-in-aid, over operating expenses shall not have exceeded a sum equivalent to 10 percent of such operating expenses. As used herein, operating expenses shall include depreciation based on cost of replacement and amortization of, and interest on, indebtedness." (See fn. 1, *ante*.)

As we immediately see, the proviso presents somewhat of a "knotty" problem, being cast as a double negative—if revenues did *not* exceed 10 percent, the hospital shall *not* be deemed to be organized or operated for profit.[2] Under the language of section 214(a)(1), the Legislature did not *automatically* exclude nonprofit hospitals earning *more* than 10 percent surplus revenues from the welfare exemption. The proviso does not address this situation on its face; it concerns only the hospital earning 10 percent or *under*. In fact, the automatic exclusion would have been a simple matter to accomplish—a mere untying of the two "knots" from the proviso would have done it. We note that in other sections of the Revenue and Taxation Code, when the Legislature wishes to exclude certain entities from a taxation exemption it can do so in clear terms. (See, e.g., § 201.2, subd. (c): "(c) This section shall not be construed to exempt any profit-making organization or concessionaire from any property tax, . . .")

---

[2] Of course, if a hospital satisfies this proviso it must still actually be nonprofit because the welfare exemption does not apply to profitmaking hospitals regardless of their earnings (Cal. Const., art. XIII, § 4, subd. (b)); moreover, to claim the exemption, the nonprofit hospital must satisfy all of the other conditions set forth in section 214(a) (i.e., subds. (2) through (6)).

Nevertheless, there is that double negative. Does that double negative make a positive? In other words, is the converse of the proviso to be implied—as County argues—so that a hospital which exceeded the 10 percent figure is deemed unable to satisfy section 214(a)(1)? These questions raise ambiguities that call for the employment of certain rules of construction.

▮ A fundamental rule of construction is that we must assume the Legislature knew what it was saying and meant what it said. (*Blew* v. *Horner* (1986) 187 Cal.App.3d 1380, 1388 [232 Cal.Rptr. 660]; *Tracy* v. *Municipal Court* (1978) 22 Cal.3d 760, 764 [150 Cal.Rptr. 785, 587 P.2d 227]; *Rich* v. *State Board of Optometry* (1965) 235 Cal.App.2d 591, 604 [45 Cal.Rptr. 512].) In related fashion, courts will not presume an intent to legislate by implication. (*People* v. *Welch* (1971) 20 Cal.App.3d 997, 1002 [98 Cal.Rptr. 113]; *First M. E. Church* v. *Los Angeles Co.* (1928) 204 Cal. 201, 204 [267 P. 703].) County has constructed section 214 on a foundation of implication which does not fare well under the weight of these rules.

Another important rule is that when the Legislature has expressly declared its intent, the courts must accept that declaration. (*Tyrone* v. *Kelley* (1973) 9 Cal.3d 1, 11 [106 Cal.Rptr. 761, 507 P.2d 65]; see *California Assn. of Psychology Providers* v. *Rank* (1990) 51 Cal.3d 1, 15 [270 Cal.Rptr. 796, 793 P.2d 2].) ▮ Here, the application of this rule requires us to consider section 214's legislative history. (See 51 Cal.3d at pp. 14-16.)

As originally enacted in 1945, section 214 did not contain the proviso found in subdivision (a)(1), and the condition stated by subdivision (a)(3) was different. The section originally read in pertinent part as follows: "[a] Property used exclusively for religious, hospital, scientific, or charitable purposes owned and operated by community chests, funds, foundations or corporations organized and operated for religious, hospital, scientific, or charitable purposes is exempt from taxation if:

"(1) The owner is not organized or operated for profit;

"(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual;

"(3) The property is not used or operated by the owner or by any other person for profit regardless of the purposes to which the profit is devoted; . . ." (Stats. 1945, ch. 241, § 1, p. 706.)

In *Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33 [244 P.2d 390], the California Supreme Court was asked whether a nonprofit hospital

which had deliberately earned an 8 percent surplus of income over expenses to be used for debt retirement and facility expansion could qualify for the welfare exemption of section 214. Relying on subdivision (a)(3) as stated above, the court said no. (39 Cal.2d at pp. 39-41.) The court acknowledged that its holding made it difficult for modern hospitals to operate in a financially sound manner to reduce indebtedness and expand their facilities, but said that matter should be addressed to the Legislature rather than the courts because subdivision (a)(3) compelled the court's holding. (39 Cal.2d at pp. 40-41.)

Responding to the challenge raised by the *Sutter* decision, the Legislature in 1953 amended section 214. (Stats. 1953, ch. 730, § 1-4, pp. 1994-1996; *Christ The Good Shepherd Lutheran Church* v. *Mathiesen* (1978) 81 Cal.App.3d 355, 365 [146 Cal.Rptr. 321].) This amendment was proposed in Assembly Bill No. 1023 (A.B. 1023). As originally introduced, A.B. 1023 rewrote subdivision (a)(3) to require simply that the property be "used for the actual operation of the exempt activity," and contained an urgency clause setting forth the Legislature's intent as follows: "This act is an urgency measure necessary for the immediate preservation of the public peace, health or safety within the meaning of Article IV of the Constitution, and shall go into immediate effect. The facts constituting such necessity are: Continuously since the adoption of the 'welfare exemption' it has been understood by the administrators of the law, as well as by the public generally, that it was the purpose and the intent of Legislature in the adoption of subdivision [a](3) of Section 214 of the Revenue and Taxation Code to disqualify for tax exemption any property of a tax exempt organization which was not used for the actual operation of the exempt activity, but that such organization could rightfully use the income from the property devoted to the exempt activity for the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies without losing the tax exempt status of its property.

"Recently, doubt has been cast upon the foregoing interpretation by a decision of the State Supreme Court involving the tax exemption of a hospital. This decision was broad in its application and has caused the postponement or actual abandonment of plans for urgently needed hospital construction and expansion at a time when there are insufficient hospital facilities in this State to properly care for the health needs of its citizens, and virtually no surplus facilities for use in case of serious epidemic or disaster. This Legislature has recognized that in addition to gifts and bequests the traditional method for the financing of the expansion and construction of voluntary religious and community nonprofit hospital facilities is through the use of receipts from the actual operating facilities. In its decision the Supreme Court indicated that this was a matter for legislative clarification.

"It has never been the intention of the Legislature that the property of nonprofit religious, hospital or charitable organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, it having been the intent of the Legislature in adopting subsection [a](3) of Section 214 to deny exemption to property not used for exempt purposes even though the income from the property was used to support an exempt activity.

"Therefore, in order to clarify the legislative intent and to remove any doubt with respect to the status of property actually used for exempt purposes, it is necessary to amend subdivision [a](3) of Section 214 of the Revenue and Taxation Code. It is essential that this be done at the earliest possible moment to avoid further delays in the construction and expansion of needed hospital facilities." (Stats. 1953, ch. 730, § 4, pp. 1995-1996.)

About three months after this urgency clause and amendment to subdivision (a)(3) were proposed in A.B. 1023, A.B. 1023 was amended to include the proviso in subdivision (a)(1) at issue here. (Stats. 1953, ch. 730, § 1, p. 1994.) Thereafter, A.B. 1023—with the urgency clause and the noted changes to subdivisions (a)(1) and (a)(3)—was enacted into law. (Stats. 1953, ch. 730, § 1, pp. 1994-1996.)

In the urgency clause, the Legislature expressly stated its intent that a section 214 organization "could rightfully use the income from the property devoted to the exempt activity for the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies without losing the tax exempt status of its property," and that "[i]t has never been the intention of the Legislature that the property of nonprofit . . . hospital . . . organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, . . ." (Stats. 1953, ch. 730, § 4, pp. 1995-1996.)

Where the Legislature has expressly declared its intent, we must accept that declaration. (*Tyrone* v. *Kelley, supra,* 9 Cal.3d at p. 11; see *California Assn. of Psychology Providers* v. *Rank, supra,* 51 Cal.3d at p. 15.) Pursuant to the legislative expression here, there is no limitation on earned revenue that *automatically* disqualifies a nonprofit hospital from obtaining the welfare exemption; the concern is whether that revenue is devoted to furthering

the exempt purpose by retiring debt, expanding facilities or saving for contingencies.[3]

It is true that the urgency clause containing the Legislature's expressed intent was made a part of A.B. 1023 before the proviso in section 214(a)(1) was added to that bill, and that the clause refers to section 214(a)(3). Regardless of timing, however, both the section 214(a)(1) proviso and the urgency clause were enacted into law as part of A.B. 1023. (Stats. 1953, ch. 730, §§ 1, 4, pp. 1995-1996.) More importantly, the urgency clause focuses on the issues of tax exemptions for *hospitals*, the urgent need for *hospital* construction and expansion, and the ways of financing that construction and expansion for nonprofit *hospitals*. It is in this context—a context fundamentally implicated by a hospital earning above the 10 percent figure in section 214(a)(1)—that the Legislature declares "[i]t has never been the intention of the Legislature that the property of nonprofit . . . hospital . . . organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies, . . ." (Stats. 1953, ch. 730, § 4, p. 1996.) In a related vein, the reference in the urgency clause to section 214(a)(3) concerns the issue of how the use of income from exempted property affects welfare exemption eligibility; this issue is also fundamentally implicated in the context of a nonprofit hospital earning a surplus revenue greater than 10 percent.

County contends the section 214 (a)(1) proviso is rendered meaningless if interpreted to allow a nonprofit hospital that earns more than 10 percent the welfare exemption; under such an interpretation, County maintains, it makes no difference whether a nonprofit hospital earns below or above the 10 percent figure—the exemption can be claimed in either instance.

We think the 10 percent figure in section 214(a)(1) is meaningful even if nonprofit hospitals that earn over that figure can still qualify for the welfare exemption. The 10 percent figure provides a clear guideline by which nonprofit hospitals can engage in sound financial practices to further the exempt activity without jeopardizing their tax exempt status, assuming they otherwise qualify for the welfare exemption. The proviso in section

---

[3]This is not to say that a nonprofit hospital can earn any amount above 10 percent and still qualify for the welfare exemption. The hospital must show that indeed it is not organized or operated for profit and that it meets all of the other conditions in section 214. One of these other conditions, section 214 (a)(3), now mandates in pertinent part that the "property [be] used for the actual operation of the exempt activity, *and . . . not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose.*" (Italics added.)

214(a)(1) recognizes the complex financial and functional realities of the modern hospital operation, an operation that often requires deliberately designed surplus revenues to ensure adequate levels of service and re-sources. (See *Sutter Hospital* v. *City of Sacramento, supra*, 39 Cal.2d at pp. 36, 39-40; see also *St. Francis Hosp.* v. *City & County of S. F.* (1955) 137 Cal.App.2d 321, 323-326 [290 P.2d 275]; *Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729, 735-736 [221 P.2d 31, 15 A.L.R.2d 1045].)

The modern hospital is an extremely complex entity—essentially, it is a minicity. (See *Cedars of Lebanon Hosp.* v. *County of L. A., supra*, 35 Cal.2d at pp. 735-745.) A modern hospital generates significant revenue but spends considerable amounts for labor, equipment, facilities and capital outlay; large and complex annual budgets are commonplace in this setting. (See *St. Francis Hosp.* v. *City & County of S. F., supra*, 137 Cal.App.2d at p. 325.) And in this setting, a surplus might be accidental rather than designed; or a particular surplus might be designed but the fate of fortuity intervenes and the budget forecasters have sleepless nights. (*Ibid.*)

Recall, section 214 was amended in light of the *Sutter Hospital* court's request for legislative intervention after the court acknowledged that its holding made it difficult for modern hospitals to operate in a financially sound manner to reduce indebtedness and expand their facilities. In that case, the nonprofit hospital purposely earned surplus revenue to retire its debt and expand its facilities. (39 Cal.2d at pp. 36, 40.) Accordingly, § 214(a)(1) provides a clear guideline by which nonprofit hospitals can deliberately design surplus revenues and not risk losing their tax exempt status (provided the other conditions of section 214 are satisfied and the revenues are used for proper purposes).

The very complexity just described and recognized in the cited cases runs counter to an interpretation that an earned surplus revenue above 10 percent *automatically* disqualifies a nonprofit hospital from the welfare exemption. To say, as County does with its interpretation of *automatic* ineligibility, that a nonprofit hospital which earned 10 percent is eligible for the exemption while the nonprofit hospital which earned 10.01 percent is *automatically* excluded from it, is to say that these complex realities are irrelevant.

Rather, the nonprofit hospital earning over 10 percent is outside the clear guideline offered by section 214(a)(1) and thereby subject to an increased scrutiny by tax authorities and an increased burden in showing it is not organized or operated for profit. Such a nonprofit hospital is no longer "deemed" to meet the condition of section 214(a)(1). In short, the proviso of

section 214(a)(1) provides no protection for the nonprofit hospital earning over 10 percent; that hospital must prove it is not organized or operated for profit under the general rule of section 214(a)(1). Contrary to County's argument, therefore, the section 214(a)(1) 10 percent proviso is meaningful even if not construed as a point of automatic disqualification.

County also relies on a 1954 opinion of the Attorney General and a 1967 opinion from the First District. The Attorney General's opinion considered whether the 1953 amendments to subdivisions (a)(1) and (a)(3) of section 214 were valid and effective in a general sense. (*Welfare Exemptions*, 23 Ops.Cal.Atty.Gen. 136 (1954).) In passing, the Attorney General noted that "[t]he Legislature might well determine that hospitals as distinguished from other organizations entitled to the welfare exemption usually operate on a schedule of rates more comparable to a schedule of rates by a commercial organization and therefore their net earnings should be restricted in order for them to have the benefit of the welfare exemption (see *Sutter Hospital* case pp. 39-40)." (*Id.* at p. 139.) The First District opinion—*San Francisco Boys' Club, Inc.* v. *County of Mendocino* (1967) 254 Cal.App.2d 548 [62 Cal.Rptr. 294]—involved profitmaking logging operations on land owned by and used for a nonprofit, charitable club for boys. Referring to the section 214(a)(1) proviso at issue here, the court noted that "the Legislature amended section 214 to permit nonprofit hospitals to have excess operating revenues in a sum equivalent to 10 percent of operating expenses." (254 Cal.App.2d at p. 557.)

Against the Attorney General's passing reference of 1954 and the First District's dicta of 1967 stands an Attorney General opinion from 1988 on the identical issue in this case. (*Welfare Exemption Qualification*, 71 Ops.Cal. Atty.Gen. 106 (1988).) In fact, it was County that requested this 1988 opinion. In that opinion, the Attorney General concluded that "[a] non-profit hospital which had earned surplus revenue in excess of ten percent during the preceding fiscal year might still qualify for the 'welfare exemption' from taxation under section 214 of the Revenue and Taxation Code." (*Id.* at p. 107.) Although it was not used as pivotal support, the 1954 Attorney General opinion was cited twice in the 1988 opinion. (*Id.* at p. 112.)[4]

The First District's opinion in *San Francisco Boys' Club* concerned an issue relating to a charitable social organization rather than a hospital. For

---

[4]County also relies on cryptic passages in certain letters written in 1953 to then Governor Earl Warren. These letters were from the attorney for the California Hospital Association, which sponsored A.B. 1023, and from the Attorney General. In deciding whether to sign A.B. 1023 amending subdivisions (a)(1) and (a)(3), Governor Warren requested the views of these two entities. These unpublished and informal expressions to the Governor—especially the letter from the hospital association attorney—are not the type of extrinsic aids that courts can meaningfully use in discerning legislative intent. (See 58 Cal.Jur.3d, Statutes, §§ 160-172, pp. 558-582.)

that reason, the analysis there is not germane to the hospital-specific provision before us. ■■ Although opinions of the Attorney General, while not binding, are entitled to great weight (*Napa Valley Educators' Assn.* v. *Napa Valley Unified School Dist.* (1987) 194 Cal.App.3d 243, 251 [239 Cal.Rptr. 395]; *Henderson* v. *Board of Education* (1978) 78 Cal.App.3d 875, 883 [144 Cal.Rptr. 568]), it is unclear how to apply this principle to the two published Attorney General opinions noted above. This principle applies because the Legislature is presumed to know of the Attorney General's formal interpretation of the statute. (*Ibid.*) But the two Attorney General opinions seem to be at odds. And while the 1954 opinion is a contemporaneous construction of long duration, the 1988 opinion involves the identical issue in this case and the Legislature amended section 214(a)(1) nonsubstantively about one and one-half years after the 1988 opinion was published. (*Welfare Exemption Qualification, supra,* 71 Ops.Cal.Atty.Gen. 106; Stats. 1989, ch. 1292, § 1.) So we return, as we must, to the words used by the Legislature in the statute and in the urgency clause's declaration of intent.

That return also provides the answer to County's final argument. County argues that its interpretation of the 10 percent figure in section 214 as a point of automatic ineligibility is supported by the language in section 214(a)(1) that qualifies the terms "operating revenues" and "operating expenses." Under section 214(a)(1), gifts, endowments and grants-in-aid are excluded from "operating revenues" while depreciation based on cost of replacement and amortization of, and interest on, indebtedness are included in "operating expenses." Basically, County argues that the Legislature has provided certain financial advantages for facility improvement, debt retirement and nonoperating revenues in section 214(a)(1), thereby intending to place a cap on what nonprofit hospitals can earn for welfare exemption eligibility.

The problem with this argument is that it is difficult to define automatic ineligibility in a more roundabout way than that suggested by County's interpretation. If the section 214(a)(1) proviso accounts favorably to nonprofit hospitals for all of the uses of net earnings that do not defeat welfare exemption eligibility, why did the Legislature include that double negative? In such a situation, the proviso would be tailor-made for dispensing with the double negative because the statute has the sound financial management practices and the allowed uses for net earnings built into it. But the section 214(a)(1) proviso, by its terms, applies only to the nonprofit hospital whose operating revenues have *not* exceeded 10 percent of operating expenses; in that situation, the proviso *deems* the nonprofit hospital in compliance with section 214(a)(1). The proviso, by its terms, does not cover the nonprofit

hospital which has earned over 10 percent; in that situation, the nonprofit hospital must *show* it is not organized or operated for profit. And the Legislature stated in the urgency clause that it has never been the Legislature's intent "that the property of nonprofit . . . hospital . . . organizations otherwise qualifying for the welfare exemption should be denied exemption if the income from the actual operation of the property for the exempt activity be devoted to the purposes of debt retirement, expansion of plant and facilities or reserve for operating contingencies . . . ."

Nor does our construction of section 214(a)(1) violate the rule of strict construction by extending the tax exemption allowed beyond the plain meaning of the language employed. (*Peninsula Covenant Church* v. *County of San Mateo, supra*, 94 Cal.App.3d at p. 392.) If we have attempted to do anything in this opinion, we have attempted to adhere to the plain meaning of the language employed in section 214(a)(1).

For all of these reasons, we conclude that a nonprofit hospital that earned surplus revenue in excess of 10 percent during the relevant fiscal year can still qualify for the "welfare exemption" from taxation under section 214.[5]

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs on appeal.

Sparks, Acting P. J. and Nicholson, J., concurred.

A petition for a rehearing was denied August 17, 1992.

---

[5]Our opinion and conclusion are limited to this single question of law. Accordingly, we express no views on whether Rideout actually was or was not organized or operated for profit or whether Rideout can obtain the welfare exemption for the specific years in question, aside from concluding that earnings in excess of 10 percent do not *automatically* disqualify Rideout from the exemption.